STATE EX REL. PALMER v. HICKMAN, STATE TREAS-URER.

[Argued January 18, 1892. Decided February 8, 1892.]

INTEREST—*State warrants—Appropriations.*—Interest is payable upon a State warrant without an express appropriation for that purpose having been first made by the legislative assembly.

SAME—*Public debt—Constitutional law.*—The term "public debt," as used in sec-34, article v. of the Constitution, providing that "no money shall be paid out of the treasury except upon appropriations made by law, . . . . except interest on the public debt," embraces the floating debt evidenced by warrants as well as the bonded indebtedness of the State.

SAME—*Same.*—Whenever there is a public debt it is not necessary for the legislative assembly to make a specific appropriation to authorize the payment of interest thereon.

SAME—*State board of examiners.*—Where a claim against the State has been considered and approved by the State board of examiners and a warrant drawn therefor, the jurisdiction of the board as to such claim ceases, and the obligation of the State to pay interest upon the principal sum mentioned in the warrant then arises by operation of law, and is beyond the control of the board of examiners.

Original proceeding. Application for a writ of mandate. On motion to strike from the answer.

*Cullen, Sanders & Shelton,* for Petitioner.

The question for the consideration of the court is, whether State warrants, duly issued by the proper authorities, and presented to the State treasurer, and not paid for want of funds, draw interest; and if they do draw interest, whether that interest is payable out of any funds in the State treasury, without a specific appropriation being made therefor. It is expressly provided by the Constitution (§ 34, art. v.) that interest on the public debt may be paid out of the treasury without specific appropriation therefor. It may be conceded that there is no question but what a State is exempt from the payment of interest, unless legislative sanction can be found therefor. In other words, a State cannot be compelled to pay interest upon its

debts unless the State, through its legislature, has given its consent that interest shall be paid. The provisions of sections 129, 130, 1122, and 1129, fifth division of the Compiled Statutes, indicate that it was the intention of the State legislature that interest at the rate of six per cent per annum should be paid, after warrants had been drawn and presented, and that those warrants should cease to bear interest from the time that the requisite notice had been given in the manner required by law. If a State warrant, drawn in pursuance of a legislative act, appropriating money for the payment of the same, is a public debt, then there can be no doubt but that no specific appropriation is necessary to authorize the State treasurer to pay interest on the same. A public debt is defined in Anderson's Law Dictionary: "A national or State obligation; a public security; rarely, if ever, the obligation of a town." This definition is taken from the case of *Morgan* v. *Cree*, 46 Vt. 786; 14 Am. Rep. 640. Bouvier's Law Dictionary defines public debt to be: "That which is due or owing by the government." (See, also, 5 Am. & Eng. Encycl. of Law, under the word "debt," p. 161, and note.) Therefore, when the State made an appropriation for the payment of an obligation, and a warrant was drawn by the proper authority on the State treasurer, that warrant became an evidence of indebtedness, which evidenced a public debt due from the State to the individual, and, being a public debt, interest on it was to be paid as required by law, and no specific appropriation was necessary therefor. The authorities which are cited to the contrary are in States where no such constitutional provision as that in Montana exists. If we were still a Territory, could it be contended for a moment that warrants will not draw interest under the territorial law? Manifestly not. Since we became a State, we have adopted the territorial laws, except where they are in conflict with the provisions of the Constitution, and there is no conflict between the law authorizing the payment of interest and the provisions of the Constitution is manifest, when the Constitution has expressly provided for the payment of interest on public debt, without an appropriation. (*Dunsmoor* v. *Furstenfeldt*, 88 Cal. 522; 22 Am. St. Rep. 331; *New Jersey Ins. Co.* v. *Meeker*, 37 N. J. L. 300; *Newell* v. *People*, 7 N. Y. 103.)

*Henri J. Haskell,* Attorney-General, for Resistant.

The State of Montana has no public debt. The authority to create a public debt is guaranteed to the legislature under a constitutional license and authority. (§ 2, art. xiii. Const.) A public debt is defined as "a sum which is owing by a government to individuals who have advanced money to it for public purposes, either in anticipation of the produce of particular branches of revenue, or on credit of the general powers which the government possesses of levying the amount necessary to pay interest for the money borrowed, or to repay the principal." (2 Cent. Dict. pp. 1478, 2409; *Newell* v. *People,* 7 N. Y. 9; *Morgan* v. *Cree,* 46 Vt. 768; 14 Am. Rep. 640.) The State may defeat the enforcement of its obligations by failure to make the necessary appropriations. (*State* v. *Porter,* 89 Ind. 260; *May* v. *Rice,* 91 Ind. 546; *Rice* v. *State of Indiana,* 95 Ind. 33.) "The right of the relator to compel the auditing and payment of his claim, must, it is evident, depend upon whether there is an appropriation upon which a warrant can be rightfully drawn, and out of which it can be lawfully paid; but if there is no such appropriation, the courts are powerless to assist him to enforce his contract, although they may not doubt its validity." (Elliott, J., 127 Ind. 204; *Ristine* v. *State,* 20 Ind. 328, 345; *Newell* v. *People,* 7 N. Y. 9; *Sunbury etc. R. R. Co.* v. *Cooper,* 33 Pa. St. 278.) Interest on the public debt cannot be paid without an appropriation. (§ 33, art. v. Const.)

BLAKE, C. J.—The affidavit of the applicant for this writ of mandate says that an act was passed March 7, 1891, by the legislative assembly of the State, which appropriated the sum of $44,648.19, out of all moneys in the treasury not otherwise appropriated, for the relief of persons named therein. That there was appropriated thereby for the Journal Publishing Company the sum of $7,909.93 for its claim for services. That the State auditor drew, March 28, 1891, the following warrant on the State treasurer, under said act:—

"STATE OF MONTANA.

"$7,909.93.                    HELENA, MONT., Mch. 28, '91.

"State Warrant. The treasurer will pay to Journal Publishing Company, or order, seven thousand nine hundred and nine

and ninety-three one hundredths dollars, for printing done and furnished to the Territory and State of Montana, paid from appropriation H. B. 141, per decision of Supreme Court, rendered Mch. 28, '91, out of any moneys in the treasury not otherwise appropriated.        E. A. KENNEY, State Auditor.

"Presented for payment and registered ———, 1891.

"———, State Treasurer."

That this warrant was then delivered to the Journal Publishing Company, and by it presented to the said treasurer. That said warrant was then registered by the State treasurer, and not paid for want of funds. That there were, December 16, 1891, in the treasury of the State, funds sufficient to pay said warrant. That the affiant was then the owner and holder of said warrant; and that the said treasurer offered to pay the affiant the sum of $7,909.93, the principal sum in the warrant, and refused to pay any interest thereon. The prayer is for a writ of mandate commanding the said treasurer to pay the interest on said warrant from March 28, 1891, at the rate of six per cent per annum.

The answer of said treasurer, among other averments, says that there has not been at any time any moneys in the said treasury which have been set apart or appropriated to pay the interest on said warrant; that respondent "denies that the last legislature set apart or appropriated any sum or sums of money to pay the interest on the warrant owned by this relator, or any other person, or at all"; that respondent "further says that said claim so presented by this relator for interest has not been presented to the State board of examiners of said State for approval, and has not been audited by said board." The applicant filed a motion to strike from the answer the last two paragraphs, which are quoted at length.

Disregarding some questions of practice which have been urged by counsel, we are called upon to consider and decide the leading and important inquiries: Is the relator entitled to recover interest upon his warrant without an express appropriation for this purpose by the legislative assembly? Should this claim for interest be submitted to the State board of examiners? It will be necessary and proper to review succinctly the legislation of the Territory of Montana upon this subject,

and observe carefully the conditions which prevailed when the framers of the Constitution assembled. The first legislative assembly convened December 12, 1864; and an act "to provide for the expenses of Montana Territory" was approved December 26, 1864. The eighth section was as follows: "That all territorial warrants issued by the proper authorities of the Territory shall draw interest at the rate of ten per cent per annum, from and after the date of their presentation, until there are funds to pay said warrants in the hands of the treasurer." These provisions were amended from time to time, but interest was always payable on territorial warrants which were not paid upon the date of their presentation. When the constitutional convention met in July, 1889, the statutes relating to this subject were in the following form: "That all territorial warrants issued by the proper authorities of this Territory after the first day of March, A. D. 1881, shall draw interest at the rate of six per centum per annum from and after the date of their presentation until there are funds to pay said warrants in the hands of the territorial treasurer." (§ 1129, Comp. Stats. fifth div.) "The treasurer shall quarterly post upon the door of his office, and publish in some newspaper published at the seat of government, a list of all warrants that he may have funds in the treasury to redeem or pay, the payment of which has not been demanded during the quarter last, and from the date of such notice the interest on all such warrants thus posted shall cease; but the treasurer shall hold in readiness such moneys to pay such warrants upon presentation." (§ 130, Comp. Stats. fifth div.) "An act to provide for the funding of the debt of Montana Territory" was passed December 3, 1867, and the first section authorizes the treasurer to issue bonds for "all territorial warrants outstanding and unpaid" at a certain time. Statutes of like import were enacted in 1872 and 1879. In July, 1889, there was no territorial debt of this character. The financial policy of the government of the Territory, which had been established at an early period of its history, was never altered in substance, and was familiar to the makers of the Constitution.

What was their action with reference to these matters? They ordained that "all laws enacted by the legislative as-

sembly of the Territory of Montana, and in force at the time the State shall be admitted into the Union, and not inconsistent with this Constitution or laws of the United States of America, shall be and remain in full force as the laws of the State until altered or repealed, or until they expire by their own limitation; provided, that whenever in said laws the words 'Territory,' 'Montana Territory,' or 'Territory of Montana' occur, the words 'State' or 'State of Montana' shall be appropriately substituted and read therefor." (Const. art. xx. § 1.) Is there any language in the Constitution of the State which is inconsistent with the foregoing sections of the Compiled Statutes? The laws *supra* were enacted by the legislative assembly of the Territory, and were in force when the State was admitted into the Union, and "remain in full force," if we shall determine this inquiry in the negative. What are the provisions of the Constitution relating to the indebtedness of the Territory or State of Montana?

The following sections, concerning the requirements of an appropriation for the payment of interest on the public debt, should be examined: "The general appropriation bills shall embrace nothing but appropriations for the ordinary expenses of the legislative, executive, and judicial departments of the State, interest on public debt. . . . ." (Art. v. § 33.) "No money shall be paid out of the treasury except upon appropriations made by law, and on warrant drawn by the proper officer in pursuance thereof, except interest on the public debt." (Art. v. § 34.) We will consider in this connection other provisions: "All taxes levied for State purposes shall be paid into the State treasury, and no money shall be drawn from the treasury but in pursuance of specific appropriations made by law." (Art. xii. § 10.) Many of the rules of construction are applicable to statutes and the Constitution. Mr. Endlich, in his work on the Interpretation of Statutes, says: "One of these presumptions is that the legislature does not intend to make any alteration in the law beyond what it explicitly declares, either in express terms or by unmistakable implication; or, in other words, beyond the immediate scope and object of the statute. In all general matters beyond, the law remains undisturbed. It is in the last degree improbable that the legislature would overthrow fundamental principles, infringe rights, or depart

from the general system of law, without expressing its intention with irresistible clearness." (§ 113, and cases cited.) The same author also writes: "As, in statutes, the presumption against an intention to change the existing law beyond the specific purpose of the enactment may create numerous apparent exceptions from the general language employed, so, in the construction of a constitutional provision, a due regard for the existing — whether statutory or common — law, may produce a similar result. . . . . In such case, no intention to abrogate previously existing laws in general can be presumed, in the absence of expression to that effect. It is therefore a sound rule of constitutional interpretation that a constitution is to be construed with reference to previous legislation." (§ 520, and cases cited.) We are therefore aided in the interpretation of these sections by resorting to the statutes of the Territory governing kindred matters. It can be fairly presumed, in the absence of plain and direct language to the contrary in the Constitution, that the uniform policy of the territorial government was to be continued under the organization of the State. We do not rely in this discussion upon mere presumptions. We have already referred to the solemn declaration of the Constitution that the legislation of the Territory, with definite exceptions, was to be carried into effect. Some of these statutes will be noticed.

The first legislative assembly, in the act *supra,* approved December 26, 1864, provides "that the auditor of the Territory is hereby empowered to issue territorial warrants, drawn upon the treasury of the Territory, in favor of all persons to whom the legislative assembly of the Territory may direct." (Stats. 1st Sess. p. 329, § 1.) This phraseology has been retained. (Comp. Stats. div. 5, § 1122.) The fourth legislative assembly re-enacted, December 7, 1867, by the authority of Congress, a law which had been approved December 15, 1866, and annulled March 2, 1867, to wit: "The territorial auditor of this Territory is hereby forbidden to issue any warrant in favor of any person drawing upon the territorial treasury for any sum, unless he is authorized by law expressly, in which the name of the party shall be specified, the nature of the service performed, and the amount specified for the performance of such service." (Stats. 3d Sess. p. 78; 14 U. S. Stats. p. 427; Stats. 4th Sess.

p. 92.) This section has not been amended. (Comp. Stats. div. 5, § 1129.) The fourth legislative assembly, by an act approved December 3, 1867, provided "that the auditor of the Territory shall issue no warrants drawn upon the territorial treasurer, in favor of any person, without express authority of law, and then shall specify the name of the party, the service performed for which the same is issued, with the amount and number of the warrant." (Stats. 4th Sess. p. 55, § 1.) This statute has not been modified. (Comp. Stats. div. 5, § 117.)

When these statutory provisions are compared, it will be seen that, although the language of the Constitution may be different, the effect was identical and the same end was accomplished. No warrant could be drawn upon the treasurer of the Territory which was not empowered by an act of the legislative assembly, and such is the declaration of the Constitution prescribing the necessity for an appropriation. The payment of interest upon the territorial warrants was regulated by the general law, and special statutes were not passed to give interest to any creditor. The interest upon the bonds of the Territory was controlled by the respective acts which authorized their creation, and no other legislation thereon was had. We recognize as the fundamental law the section, *supra*, which does not require an appropriation to enable the proper officer to pay the interest upon the public debt of the State.

In what manner has this fiscal department been affected by the transition from the territorial to the State system of government? Where is the clause in the Constitution which has ordained that any other mode shall be adopted with respect to the payment of interest on warrants in the transaction of similar business for the State? It is insisted, however, that the expression, "public debt," was used in its limited sense, and comprehends solely one class of indebtedness — bonds. Upon the other hand, it is asserted that the words have a broad meaning, and include every species of liability. Partial definitions can be produced which support both sides of the contention. The term "public," in the foregoing sections, designates the debt as that of the State of Montana.

This identical phrase, "public debt," is employed in the fourteenth amendment to the Federal Constitution: "The va-

lidity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations, and claims shall be held illegal and void." The words " debts, obligations, and claims" have been selected with precision; and the distinctions are drawn between the ways in which the debt can be authorized or incurred. Judge Cooley states that the chief object of this section when amended was: "To protect the credit of the nation — *First,* by affirming the unquestionable character of the national indebtedness; and *second,* by precluding the assumption by the nation of obligations with which it could not with any justice be burdened." (2 Story on the Constitution [5th ed.], § 1965.) Judge Cooley includes, by the words "national indebtedness," the public debt and other debts of the United States which have been incurred.

What, then, is the debt of the State? The framers of our Constitution performed their grave duties in the light of this financial legislation of the Territory. They could clearly and definitely restrict the effect of the words "public debt" by the insertion of the term "bonded," or any other modifying clause. Was this language employed in its ordinary signification? Let us consult other paragraphs of the Constitution, and define accurately, if possible, the *status* of this debt. The constitutional convention agreed upon the phrase "public indebtedness" as the title to article xiii. The second section is as follows: "The legislative assembly shall not in any manner create any debt except by a law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged. Such law shall specify the purpose to which the funds so raised shall be applied, and provide for the levy of a tax sufficient to pay the interest on and extinguish the principal of such debt, within the time limited by such law for the payment thereof; but no debt or liability shall be created which shall, singly or in the aggregate, with any existing debt or lia-

bility, exceed the sum of one hundred thousand dollars." "The State shall not assume the debt, or any part thereof, of any county, city, town, or municipal corporation." (Art. xiii. § 4.) The fifth section provides that "no county shall be allowed to become indebted, in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding. . . . ; and all bonds or obligations in excess of such amount, given by or on behalf of such county, shall be void. No county shall incur any indebtedness or liability for any single purpose to an amount exceeding ten thousand dollars. . . . ." The sixth section relates to the indebtedness of a city, town, township, or school district, and embodies similar limitations, and authorizes municipal corporations to devote the revenues derived from their water supply "to the payment of the debt." "All obligations of the Territory of Montana existing, in force, and unpaid at the time of the admission of the State into the Union are hereby assumed by the State, which shall and will well and truly pay the same." (Art. xx. § 12.) The words "debt," "indebtedness," "obligations," and "liabilities" are repeatedly applied to various subjects which sustain no relation to the sections concerning "the public debt."

Similar constitutional provisions concerning the indebtedness of counties have been exhaustively investigated, and it has been generally held that it was not limited to what existed in the shape of bonds. (*People* v. *May*, 9 Colo. 80, 404; *Law* v. *People*, 87 Ill. 385; *Appeal of Erie*, 91 Pa. St. 398.) In *People* v. *May*, 9 Colo. 95, the court, by Mr. Justice Elbert, said: "To say that the framers of the Constitution saw no danger save in 'bonded indebtedness' is to credit them with a very limited statesmanship; and to say that they trusted to 'wisdom and discretion' as restraints is to impute to them a very sanguine statesmanship. . . . . Nor are we to suppose that they dealt with the important question of public indebtedness other than in a practical manner; that they made an unsubstantial distinction, and limited the form and not the amount of indebtedness. The indebtedness was the essential thing. The mischief would be the same, and the burden the same, whether the debt was 'by loan' evidenced by bonds, or a floating debt evidenced by warrants."

In *Appeal of Erie, supra,* the court construed a section of the Constitution which provided that "the debt of any county . . . . shall never exceed seven per centum upon the assessed value of the property therein," and said : "A debt means a fixed and certain obligation to pay money, or some other valuable thing or things, either in the present or in the future. . . . . It is idle to urge that the restriction includes only a bonded indebtedness, for such is neither the constitutional letter nor spirit. A floating debt usually ends in a bonded debt, and the former is just as obligatory as the latter."

Judge Brewer decided in *Rollins* v. *Lake Co.* 34 Fed. Rep. 845, that county warrants which had been issued in payment of the fees of witnesses, jurors, constables, and sheriffs, after the constitutional limit of its indebtedness had been reached, were not within the prohibition, and thereby overruled, in part, *People* v. *May, supra.* This judgment was reversed by the Supreme Court of the United States. (*Lake Co.* v. *Rollins,* 130 U. S. 662.) Mr. Justice Lamar, for the court, said : "Neither can we assent to the position of the court below that there is, as to this case, a difference between indebtedness incurred by contracts of the county and that form of debt denominated 'compulsory obligations.' The compulsion was imposed by the legislature of the State, even if it can be said correctly that the compulsion was to incur debt; and the legislature could no more impose it than the county could voluntarily assume it, as against the disability of a constitutional prohibition."

The same doctrine is enforced regarding the obligations of towns and cities. The court said in *City of Council Bluffs* v. *Stewart,* 51 Iowa, 389 : "When a warrant is drawn upon the treasurer, if the money is in the hands of the treasurer to pay it, the reasonable expectation is that it will be presented and paid. By such act, no debt as contemplated in the Constitution is incurred. If, however, no funds are on hand to pay the warrant, a debt is incurred." (See, also, *Salem W. Co.* v. *Salem,* 5 Or. 29.)

Blackstone says : "Whatever, therefore, the laws order any one to pay, that becomes instantly a debt which he hath beforehand contracted to discharge." (3 Blackst. Com. p. 160.) This definition was followed in *Gray* v. *Bennett,* 3 Met. 526, by Mr.

Justice Hubbard, who said: "The word 'debt' is of large import, including, not only debts of record, or judgments, and debts by specialty, but also obligations arising under simple contract, to a very wide extent, and in its popular sense includes all that is due to a man under any form of obligation or promise."

In *People* v. *Johnson*, 6 Cal. 499, Chief Justice Murray said: "A debt or liability may be created in other ways than by the borrowing of money. It may be created by appropriation, where there is no money to meet it. It may be created by drawing on a fund, where there is no cash in the treasury or incoming revenue to satisfy such drafts." (*Dunsmoor* v. *Furstenfeldt*, 88 Cal. 522; 22 Am. St. Rep. 331.)

When our Constitution is considered as a whole, and the authorities are analyzed, the term "public debt" cannot be confined to what is evidenced by one form of indebtedness or liability, but embraces warrants as well as bonds. There is no language which indicates that the framers of this instrument had any other intention. Whenever there is a public debt, it is not necessary for the legislative assembly to make a specific appropriation to authorize the payment of any interest thereon. The law which creates the debt of the State by means of a loan must provide for the levy of a tax to pay the interest thereon. (Art. xiii. § 2.) This section is silent upon the subject of an appropriation by the legislative assembly for the payment of interest. When a public debt has been brought into being through an unpaid warrant, the statute, *supra*, fixes the rate of interest, and points out the steps which are required to secure it. The Constitution does not directly or indirectly modify the force of these laws.

The rule that repeals by implication are not favored is applicable when the repugnancy is alleged to exist between the provisions of a constitution and a statute. (*Ohio* v. *Dudley*, 1 Ohio St. 437.) We are compelled, by the rules of constitutional construction, to hold that this legislation of the Territory regulating the payment of warrants upon the treasury has not been interrupted by the formation of the State government. The interest which has been prescribed by law is an inseparable part of the liabilities or obligations which are evidenced by the warrant.

The Constitution declares that the governor, secretary of State, and attorney-general "shall constitute a board of examiners, with power to examine all claims against the State, except salaries or compensation of officers, fixed by law, and perform such other duties as may be prescribed by law. And no claims against the State except for salaries and compensation of officers fixed by law shall be passed upon by the legislative assembly without first having been considered and acted upon by said board." (Art. vii. § 20.) By virtue of this authority an act prescribing its duties was approved February 12, 1891. (State Stats. 2d Sess. p. 183.) This claim of the Journal Publishing Company was first considered and acted upon by the board. It was then passed upon by the legislative assembly, and an appropriation was made for its payment. Afterwards it was approved by the board, and transmitted to the office of the State auditor, who has drawn his warrant for the proper amount. The jurisdiction of the State board of examiners of this claim was exercised completely under the law. The obligation to pay interest upon the principal sum mentioned in a warrant arises by operation of law under conditions which are independent of, and cannot be controlled by the action of the board. It is therefore our opinion that the relator is not obliged to show that the legislative assembly made an appropriation to pay the interest upon his warrant, or that the State board of examiners has audited his claim for interest upon the same.

It is ordered that the motion to strike out the portions of the answer referred to be sustained.

*Motion sustained.*

HARWOOD. J., and DE WITT, J., concur.