THE HON. WILLIAM L. HOLLOWAY,
THE HON. ALBERT J. GALEN,
THE HON. ALBERT P. STARK,
THE HON. JOHN A. MATTHEWS,
⎱ Associate Justices.

---

·STATE EX REL. TOOMEY, RELATOR, v. STATE BOARD
OF EXAMINERS ET AL., RESPONDENTS.

(No. 5,740.)

(Submitted June 1, 1925. Decided June 29, 1925.)

[238 Pac. 316.]

*State Treasury Notes—Validity of Statute—Constitutional
Law—Creating Indebtedness—What Does not Constitute.*

Statutes—Constitutionality—Presumption.
   1. The constitutionality of a statute is *prima facie* presumed, and
   every intendment is in favor of upholding it unless it appears uncon-
   stitutional beyond a reasonable doubt.
Constitution—Construction—Rule.
   2. The fundamental purpose of construing a constitutional provision
   being to give effect to the intent of its framers and of the people
   who adopted it, its construction should not be technical but liberal.
State Treasury Notes—Statute—Validity.
   3. *Held*, that Chapter 176, Laws of 1925, authorizing the sale of
   state treasury notes to secure funds for the payment of outstanding

74 Mont.—1                    (1)

warrants, attacked on constitutional grounds referred to below, is valid.

Same—Constitution — Payment of State Moneys — Appropriation—What Sufficient.

4.  Section 34, Article V of the Constitution, providing that no money shall be paid out of the state treasury except upon appropriation "made by law," does not require the introduction of an appropriation bill, the requirement being met by an appropriation sanctioned by law.

Same—Payment of State Funds on Warrant—Constitution.

5.  There being no constitutional or statutory provision that all state warrants shall be drawn by the state auditor, and a warrant being merely an order by which one of competent authority empowers another to pay a particular sum of money, and in view of the provision of section 34, Article V of the Constitution, authorizing payment of state funds on warrant drawn by the "proper officer," *held*, that Chapter 176, above, is not rendered invalid for failing to provide payment of principal and interest of state treasury notes on warrant drawn by the auditor and in providing for payment directly by the treasurer.

Same—Constitution — Appropriation of State Funds — What Sufficiently Specific.

6.  Under the rule that that is certain which can be made certain, *held* that Chapter 176, above, does not violate the provision of section 10, Article XII of the Constitution, as appropriating an indefinite sum for payment of principal and interest of state treasury notes, the payments to be made being readily ascertainable by mathematical calculation.

Same—Constitution—Appropriations in Excess of Income.

7.  The provision of section 12, Article XII of the Constitution, that no appropriations shall be made in excess of the total tax provided for by law during any fiscal year, must be interpreted to refer not only to the money raised by direct taxation but also to anticipated income from all other sources.

Pleadings—Insufficient Complaint—Presumption.

8.  Where seasonable attack is made upon the complaint for want of substantive allegations, the court should indulge, as against the pleader, the presumption that he has stated his cause of action as strongly as he can.

State Treasury Notes—Appropriations in Excess of State Income—Complaint—Insufficiency.

9.  Where an Act appropriating money is attacked on the ground that the appropriation exceeds the state's income, the plaintiff is not entitled to any relief in the absence of an allegation that other appropriations theretofore made exceeded the difference between the appropriation attacked and the anticipated income of the state.

Legislature—Enactment of Laws—Time of Enactment.

10.  Since the governor in the approval of laws is a component part of the legislature and no bill can become a law (with certain exceptions) without his approval, his approval fixes the time when it becomes a law, the order in which bills are passed in the two houses being immaterial.

Appeal—*Obiter Dictum.*

11.  The rule that courts will not pass upon questions not necessary to a decision is especially applicable where the question is a constitutional one.

Constitution—Limitation of Power—State Warrants—Registration Authorized.
   12.   The state Constitution is a limitation upon the inherent power of the legislature; it therefore may do all things not prohibited thereby; hence it may properly provide for the registration of state warrants, the Constitution not having provided otherwise.

State Treasury Notes—Nature of Instruments.
   13.   The treasury notes authorized by Chapter 176, Laws of 1925, to take up outstanding state warrants, constitute evidences of indebtedness, but stand in no different position as an obligation of the state than do the warrants themselves, and therefore do not change its obligation in any way.

Same—Issuance not Creation of Debt.
   14.   By the issuance of state treasury notes to secure funds to pay outstanding registered warrants, no new debt is created within the meaning of section 2 of Article XIII of the Constitution, the effect of their authorization being merely to change the evidence of indebtedness from warrants to treasury notes.

Same—Creation of Debt—Constitutional Provision Inapplicable.
   15.   *Held,* that the provision of section 2, Article XIII of the Constitution, prohibiting the creation of a debt exceeding singly or in the aggregate with existing debts the sum of $100,000, unless authorized by the people at a general election, was not intended to apply to an issue of treasury notes to refund outstanding warrants issued for current state expenses.

Same—Statute not Indefinite.
   16.   Courts will not declare a statute void for uncertainty if it is possible to ascertain its meaning and give it an intelligible construction, and under that rule, *held* that Chapter 176, above, is not open to the objection that it is so inherently indefinite and uncertain that it cannot be enforced.

Constitutional Law, 12 C. J., sec. 43, p. 700, n. 74; p. 701, n. 79; sec. 212, p. 780, n. 98; sec. 221, p. 791, n. 19; sec. 222, p. 794, n. 26; p. 797, n. 34; sec. 237, p. 805, n. 48.
   Pleading, 31 Cyc., p. 81, n. 7.
   States, 36 Cyc., p. 883, n. 27; p. 884, n. 33; p. 892, n. 13, 17; p. 895, n. 47, 48, 51; p. 898, n. 91; p. 917, n. 94.
   Statutes, 36 Cyc., p. 969, n. 91; p. 1197, n. 46.

Original action by the State, on the relation of E. G. Toomey, to enjoin the State Board of Examiners and members thereof from executing the provisions of Chapter 176, Laws of 1925, with reference to the issue of state treasury notes. Dismissed.

*Mr. E. G. Toomey, pro se,* submitted a brief and argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. A. H. Angstman,* Assistant Attorney General, for Respondents, submitted a brief; *Mr. Angstman* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This is a taxpayer's suit to enjoin the state board of examiners and the members thereof from carrying into execution the provisions of Chapter 176, Laws of 1925. The petition alleges that the Act is unconstitutional, but that, nevertheless, unless restrained, the board will proceed thereunder. On the filing of the petition an order to show cause was duly issued, and in response thereto the board demurred to the petition upon the ground that the same does not state facts sufficient to constitute a cause of action or to entitle the relator to the relief sought.

The purpose of the Act in question is expressed in its preamble, to-wit: "It appearing that there are now outstanding and unpaid valid warrants, chargeable against the general fund of the state, * * * in excess of three million seven hundred and fifty thousand dollars, * * * bearing interest at the rate of six per cent per annum," and that there is no money in the said fund to pay the warrants, and it further "appearing that said warrants can be refunded * * * at a much lower rate of interest" and a large saving made to the state, it is proposed to issue and sell state treasury notes for the amount of $3,750,000, these notes to bear interest at a rate not to exceed four per cent per annum.

Section 1 authorizes the state board of examiners to issue and sell the treasury notes referred to, and provides that the proceeds therefrom shall be deposited in the general fund, and shall be used exclusively for the payment of the outstanding warrants mentioned.

Section 2 provides for the issuance of these treasury notes in series, and in such denominations as may be determined by the board, and shall become due and payable as follows:

"Series A—$1,000,000.00 January 15, 1926.

"Series B—$1,250,000.00 July 15, 1926.

"Series C—$1,500,000.00 January 15, 1927."

Section 3 empowers the board to prescribe the form of the notes, and that "each series shall bear upon its face the words: 'Refunding Treasury Notes of the State of Montana,'" signed by the members of the board and bearing the great seal of the state of Montana, and shall have interest coupons attached, the first coupons to be payable July 15, 1925.

Section 4: "The treasury notes provided for in this Act shall be disposed of by the state board of examiners in such manner as they shall deem for the best interests of the state for the carrying out of the purposes and provisions of this Act; provided, that no treasury note shall be disposed of for less than par value and accrued interest to date of sale."

Section 5 provides that the notes shall be payable to bearer at the office of the state treasurer, and entitled to payment in the order of their presentation, provided that the board may provide for payment at some bank or trust company in New York, to be selected by the board.

Section 6: "For the purpose of paying said treasury notes, as the same become due and of paying interest maturing thereon, there is hereby created in the treasury of the state of Montana a special fund to be known as the 'Treasury Note Redemption Fund,' and so much of the moneys accruing to the general fund in the treasury of the state of Montana as will equal the amount of said treasury notes and interest coupons issued and outstanding, and due at any interest paying period are hereby apportioned to, set apart to, and shall be paid into and transferred to said treasury note redemption fund, and the said treasury note redemption fund and all moneys accruing, or to accrue therein are

hereby appropriated exclusively to and for the payment of such treasury notes and the interest thereon; provided, that apportionments to said treasury note redemption fund shall be made semiannually and only in such amounts and at such times as shall be necessary to meet each semiannual charge."

Section 7 authorizes the state treasurer, on maturity, to pay these treasury notes on presentation at his office, or at the bank designated by the board, in the order of their presentation and out of the "Treasury Note Redemption Fund."

Section 8 makes a special appropriation for the payment of the expense of carrying out the provisions of the Act.

This Act is attacked upon constitutional grounds, and, in the consideration of the questions raised, it must be borne in mind that we are passing upon the validity of the acts of a co-ordinate branch of the state government, and that "In exercising this high authority, the judges claim no judicial supremacy; they are only the administrators of the public will. If an Act of the legislature is held void, it is not because the judges have any control over the legislative power, but because the Act is forbidden by the Constitution, and because the will of the people, which is therein declared, is paramount to that of their representatives expressed in any law." (*Lindsay* v. *Commissioners,* 2 Bay (S. C.), 38.) "Nevertheless, in declaring a law unconstitutional, a court must necessarily cover the same ground which has already been covered by the legislative department in deciding upon the propriety of enacting the law, and they must indirectly overrule the decision of that co-ordinate department. The task is therefore a delicate one, and only entered upon with reluctance and hesitation." (Cooley on Constitutional Limitations, p. 226.)

For these reasons courts have held generally, and the rule is declared by this court, that "the constitutionality of a [1] legislative enactment is *prima facie* presumed, and every intendment is in favor of upholding it unless it appears

unconstitutional beyond a reasonable doubt.'' (*State ex rel. Bonner* v. *Dixon*, 59 Mont. 58, 195 Pac. 841; *State ex rel. Peyton* v. *Cunningham*, 39 Mont. 197, 18 Ann. Cas. 705, 103 Pac. 497; *Spratt* v. *Helena P. T. Co.*, 37 Mont. 60, 94 Pac. 631.)

"The fundamental purpose of construing a constitutional [2] provision is to give effect to the intent of its framers and of the people who adopted it.'' (12 C. J. 907.) To this end the construction should not be technical, but the provision under consideration should be liberally construed to determine its primary purpose. (*State ex rel. Harrington* v. *Kenney*, 10 Mont. 410, 25 Pac. 1022.)

With these principles in mind, we will take up the questions presented in the order in which they are argued by relator.

1. Relator contends that the Act violates section 34 of Article V of our Constitution, which reads as follows: "No [3] money shall be paid out of the treasury except upon appropriations made by law, and on warrant drawn by the proper officer in pursuance thereof, except interest on the public debt.''

(a) It is first suggested, but not seriously urged, that there was no appropriation made.

The word "appropriation'' is defined by Webster as "the act of setting apart or assigning to a particular use or person:   * * *   the application to a special use or purpose   * * *   as of money to carry out some public object,'' which definition has received the sanction of this court. (*State ex rel. Rotwitt* v. *Hickman*, 9 Mont. 370, 8 L. R. A. 403, 23 Pac. 740.) This setting apart or designation of the purpose for which public money may be used must be "made by law.'' This provision, however, does not require the introduction in the legislature of an appropriation bill, but the act may be accomplished in any manner receiving the sanction of the law. (*State ex rel. Rotwitt* v. *Hickman*, above; *State ex rel. Buck* v. *Hickman*, 10 Mont.

497, 26 Pac. 386; *State ex rel. Journal Pub. Co.* v. *Kenney,* 9 Mont. 389, 24 Pac. 96; *State ex rel. Palmer* v. *Hickman,* 11 Mont. 541, 29 Pac. 92.)

Section 6 of the Act, as hereinbefore quoted, requires a transfer of a sufficient amount to meet the principal and interest payments as they fall due, from the general fund to the "Treasury Note Redemption Fund," and then declares that all of the money so diverted is "appropriated" to the payment of these treasury notes. While there is no direct appropriation from the general fund, the Act is sufficient to meet the requirement of this provision.

(b) After an appropriation has been made, the money [4] appropriated can only be paid out on "a warrant by the proper officer in pursuance thereof." Relator contends that this inhibition requires that all warrants must be drawn by the state auditor, and that, as this Act does not provide for action by that official, it is violative of the section quoted. However, a warrant is merely "an order by which one of competent authority authorizes another to pay a particular sum of money." (*State* v. *Fenly,* 18 Mo. 445; *National Bank* v. *Greenlaw,* 134 Cal. 673, 66 Pac. 963; *Shawnee County* v. *Carter,* 2 Kan. 115.) The terms "warrant" and "order" are synonymous. (*State* v. *Woods,* 112 La. 617, 36 South. 626.)

We find no provision in the Constitution requiring that all state warrants be issued by the state auditor, and no statutory provision to that effect. The Constitution (sec. 1, Art. VII) provides for a state auditor, and had its framers intended to declare that all state warrants shall be issued by this particular officer, they would have experienced no trouble in so framing this provision. By the use of the phrase "the proper officer" they evidently intended that, at some future time, special funds in the treasury might be handled through some other office than that of the auditor, and warrants or orders issued by such other "proper officer."

In the case of *State ex rel. Rotwitt* v. *Hickman,* above, it is declared that this entire section was "obviously inserted to prevent the expenditure of the people's treasure without their consent, either as expressed by themselves in the organic law or by their representatives in constitutional Acts of legislation."

When we reflect that the expenditures herein considered are authorized only in the payment of claims which have already been audited and approved by the state board of examiners and in lieu of warrants which have already been issued by the state auditor, the construction which we are now asked to place on this provision would be extremely technical and strict rather than liberal. The "people's treasure" is sufficiently safeguarded, if the Act is valid otherwise, by the issuance of an order by competent authority for the payment of the money appropriated by the Act. These treasury notes "stand in no different position as an obligation of the state than registered warrants" (*State ex rel. Rankin* v. *State Board,* 59 Mont. 557, 197 Pac. 988), and constitute a sufficient warrant drawn by the proper officer.

As there is no constitutional mandate requiring that warrants be issued only by the state auditor, the legislature was free to provide that the orders for payment be issued by any other "proper officer."

2. The second contention of relator is that the Act violates [5] section 10, Article XII, of the Constitution, which reads: "All taxes levied for state purposes shall be paid into the state treasury and no money shall be drawn [therefrom] but in pursuance of specific appropriations made by law."

Relator insists that this appropriation is not for a definite sum, and that the Act delegates the authority of the legislature to administrative officers, and is therefore not "specific."

(a) He cites the following authorities to the effect that the power to determine how, when and for what purpose public funds shall be applied is vested exclusively in the

legislative branch of the government: *State* v. *Burdick,* 4 Wyo. 272, 24 L. R. A. 266, 33 Pac. 125; *People* v. *Brooks,* 16 Cal. 11. With this declaration we are in full accord. However, by the provisions of the Act in question, our legislative assembly exercised that power; the amount of principal is definite; and, when the treasury notes are sold, the rate of interest will be fixed within the maximum provided in the Act. Nothing is left then to the executive officers but a mathematical calculation. The rule that "that is certain which can be made certain" applies to appropriations. (*Town of Highgate* v. *State,* 59 Vt. 39, 7 Atl. 898; *State ex rel. Farrar* v. *Hipple,* 7 S. D. 234, 64 N. W. 120; *State ex rel. Ledwith* v. *Searle,* 79 Neb. 111, 112 N. W. 380; *Norcross* v. *Cole,* 44 Nev. 88, 169 Pac. 877; *Holmes* v. *Olcott,* 96 Or. 33, 189 Pac. 202.)

A "specific" appropriation is defined in 36 Cyc. 892, as follows: "A specific appropriation is an Act by which a named sum of money is set apart in the treasury and devoted to the payment of particular claims or demands. The appropriation must be specific as to the amount or fund appropriated and as to the object for which the appropriation is made, it being sufficient, however, if the amount is capable of being determined, and it is not essential that the amount be certainly ascertained prior to the appropriation."

In *People* v. *Miner,* 46 Ill. 384, the court said: "It is not essential or vital to an appropriation that it should be of an amount certainly ascertained prior to the appropriation. There is no requirement of that kind in the Constitution."

Inasmuch as the exact amount of the appropriation will be made certain merely by mathematical computation, if the provisions of the Act are carried into effect, this Act sufficiently complies with this provision of the Constitution.

3. Relator next contends that the Act violates section 12, [6] Article XII, of the Constitution, which in so far as applicable to the objection raised, reads: "No appropriation

shall be made nor any expenditures authorized by the legislative assembly whereby the expenditures of the state during any fiscal year shall exceed the total tax then provided for by law, and applicable to such appropriation or expenditures, unless the legislative assembly making such appropriation shall provide for levying a sufficient tax, not exceeding the rate allowed in section nine (9) of this Article, to pay such appropriations or expenditures within such fiscal year.''

The contention now under consideration is that the Act challenged appropriates the sum of $3,750,000, which, with other appropriations, authorizes expenditures during the fiscal years ending June 30, 1926, and June 30, 1927, of over $1,000,000 in excess of the total tax provided by law for those fiscal years.

While the provision above seems to limit such appropria-
[7] tions or expenditures to the "total tax," the legitimate appropriations and expenditures cover the anticipated income from all sources, subject to appropriation. In *Fergus v. Brady*, 277 Ill. 272, Ann. Cas. 1918B, 220, 115 N. E. 393, this fact is made clear by the following statement: "There is a very large amount of money paid into the state treasury from other sources than direct taxation, and the ordinary meaning of the word is the total income of the government, derived from all sources, subject to be applied to public purposes. It would not be reasonable to say that appropriations which are not to exceed income should be limited to moneys raised by direct taxation while there are large sums of money which may be applied to the purposes of the government not taken into account." That this is the rule to be applied is impliedly admitted by relator in his complaint, wherein reference is made to the receipts from the *ad valorem* tax and from license and inheritance taxes.

That the provision should be interpreted to refer not only to the income from all available sources, but also to anticipated income, has been declared by this court in *State ex*

*rel. Bennett* v. *Board of Examiners,* 40 Mont. 59, 104 Pac. 1055, where it is said: ''The limitation is addressed to the legislature itself, the taxing body, exclusively. * * * It is compelled to act upon the facts at hand and conditions determinable from the circumstances as they exist. It cannot be required to anticipate all the conditions which may possibly arise in the interim; nor may it, in attempting to anticipate supposed contingencies, incorporate in its Acts such conditions and provisions as will render it impossible for the disbursing officers to carry forward the business of the government.''

The attorney general suggests that it is now anticipated that, by reason of the passing of one of the state's prominent citizens, the inheritance tax law will, within the period of this Act, bring in more than enough to make up any deficiency in income; but the legislative assembly could not have at the time of the passage of this Act anticipated that lamentable event, and the present anticipation of additional revenue cannot aid the respondents, if the Act, at the time of its passage, was violative of this provision of the Constitution.

Further, this matter is before us only on the complaint of relator and respondents' demurrer thereto, which admits the truth of all facts properly pleaded. Whether, therefore, the Act violates this provision of the Constitution depends, not on what are the fact conditions, but on what facts are disclosed in the complaint, and whether those facts pleaded show such violation.

The complaint alleges that in addition to the attempted appropriation of $3,750,000, by this Act ''there was also appropriated by the legislative assembly, out of the general fund of the state, for the said fiscal years ending June 30, 1926, and June 30, 1927, respectively, for the general operation of the state government, a total sum in excess of $3,000,000, which together with the attempted appropriation * * * amounts to the sum of $6,750,000; that the

total tax provided by law, and applicable to such appropriations and expenditures during said two fiscal years, will not exceed $5,750,000.'' We have, then, the allegation that the total appropriations for the next two years exceed the anticipated income by $1,000,000, which, for the purpose of this hearing, is admitted to be the fact. The question now before us is whether, by these allegations, the pleader has alleged facts sufficient to entitle him to the relief sought.

It will be noted that these allegations, while disclosing that the appropriations mentioned were made separately, do not disclose whether the Appropriation Act here attacked was passed before or after the making of the other appropriations referred to.

This provision of the Constitution, unlike section 2 of Article XIII, does not declare that the appropriations shall not "singly or in the aggregate" increase the expenditures in any fiscal year to a point where they exceed the anticipated income. Manifestly, under this provision, the legislative assembly may continue to appropriate money from the general fund for legitimate purposes until the constitutional limit is reached.

There is neither constitutional nor statutory mandate as to the order in which the legislative assembly shall make appropriations nor in which the governor shall approve appropriation bills; no preference is therefore given by law to the current expenses of maintaining the state government during the ensuing fiscal years. If, therefore, this appropriation was the only appropriation made by the last legislative assembly and approved by the governor, and the estimated total income of the state exceeds the appropriation, as it does, by $2,000,000, would the allegation of those facts be sufficient to entitle the relator to the relief sought? The question can only be answered in the negative.

How, then, does the allegation that other appropriations totaling $3,000,000 were made, without reference to the order of the passage of the appropriation bills, aid the pleader?

It is elemental that the pleader must allege all facts material to his cause of action directly, in ordinary and concise language, and with reasonable certainty. And, where a seasonable attack is made upon the complaint for want of substantive allegations, the court should indulge, as against the pleader, the presumption that he has stated his cause of action as strongly as he can. (*Conrad Nat. Bank* v. *Great Northern Ry. Co.*, 24 Mont. 178, 61 Pac. 1.) As relator has failed to allege in his petition that at the time this appropriation was made other appropriations theretofore made exceeded the difference between the amount of this appropriation and the anticipated income of the state for the period named, he has, in this regard, failed to state facts sufficient to entitle him to the relief sought. The presumption is that he has stated his cause of action as strongly as he can, and that therefore the complaint cannot be amended to state a cause of action; but aside from the presumption it appears that, in this particular, such is the case.

By reference to the Acts of the nineteenth legislative assembly we find that the Act under consideration was approved by the governor on March 16, 1925. Its final section declares that it shall be in full force and effect from and after its passage and approval. And we further find that House Bill No. 448, a general appropriation measure providing for the current expenses of state offices and bureaus, carrying appropriations of more than $1,069,000, was approved by the governor on March 20, 1925. It also provided that it shall be in full force and effect from and after its passage and approval. Furthermore, section 12, Article VII, of the Constitution, provides that no Act of the legislative assembly shall become a law without the approval of the governor, except it be passed over his veto or held by him a period of five days while the legislature is in session. And in the approval of laws the governor is a component part of the legislature. (Cooley on Constitutional Limitations, 220; *Fowler* v. *Peirce*, 2 Cal. 165.) Therefore,

no matter what the order of the passage of these two appropriation bills in the two houses of the legislature, neither had any force or effect until approved by the governor, which act, on the part of the chief executive, as a component part of the legislature, fixed the time when each became a law, and, as the general appropriation bill mentioned became a law four days later than did the Act attacked, and carried appropriations in excess of the amount named by relator as an overappropriation for the two fiscal years designated, it is clear that the complaint cannot, in this respect, be amended to state a cause of action as against Chapter 176, Laws of 1925.

Whether the passage and approval of the general appropriation bill did, in fact, violate this provision of the Constitution is a question not before us in this action, and we expressly disavow any intention, by anything said in this opinion, to intimate as to how this question, if properly presented, would be determined. Courts are never justified [11] in passing upon a question not necessary to a decision in · the matter before it, and will particularly "avoid the consideration of constitutional questions except when forced on them in forms of procedure permitting due argument and deliberation." (Bishop on the Written Laws, sec. 35, p. 33; *Potter* v. *Furnish*, 46 Mont. 391, 128 Pac. 542.)

4. Relator asserts that the Act violates section 2 of Article XIII of the Constitution, which provides:

"The legislative assembly shall not in any manner create any debt except by law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid and discharged; such law shall specify the purpose to which the funds so raised shall be applied and provide for the levy of a tax sufficient to pay the interest on, and extinguish the principal of such debt within the time limited by such law for the payment thereof; but no debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred

thousand dollars ($100,000) except in case of war, to repel invasion or suppress insurrection, unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for and against it at such election."

If the Act does, within the meaning of this provision, "create" a debt, it is manifestly invalid, for the legislative assembly neither provided for the levy of a tax for the extinguishment of the indebtedness nor submitted the Act to a vote of the people of the state.

(a) Relator submits that in this state there is no con-[12] stitutional authority for the registration of warrants. This is true, but a state Constitution, unlike its federal counterpart, is a limitation upon the inherent powers of the legislative body, which are restricted only by the provisions of the Constitution. (*State ex rel. Sam Toi* v. *French,* 17 Mont. 54, 30 L. R. A. 415, 41 Pac. 1078.) The Constitution being silent upon the subject, the assembly was free to provide for the registration of state warrants, so long as no constitutional prohibition was violated, and this it did as far back as 1889.

(b) Relator insists that these outstanding warrants are not "evidences of indebtedness" but are merely evidences of claims against the state, citing *Bryan* v. *Menefee,* 21 Okl. 1, 95 Pac. 471, in which this language is used: "The term 'evidence of indebtedness' certainly means a bond or such indebtedness as is usually evidenced by a bond, but which may be evidenced by a certificate of indebtedness not under seal, or instruments executed without the formalities of a bond, under the common law" and asks us to adopt the definition of a "debt" given in 1 Words and Phrases, Second Series, at page 1226, and in *Morril* v. *Bentley,* 150 Iowa, 677, 130 N. W. 734, as follows: "A sum of money due by certain and express agreements founded upon an express or implied contract to pay a certain amount at a certain time." He asserts that the mere owing of money does

not create a debt, but that the debt comes into being only upon a promise to pay. While it is true that, in order to create an obligation, there must be a promise to pay, we are unable to appreciate the fine distinctions drawn.

Our statute provides that it is presumed "that official duty has been regularly performed" (Sec. 10606, subd. 15, Rev. Codes 1921), and therefore these registered warrants, nothing to the contrary appearing, represent claims duly presented to the state board, audited and approved, and passed on to the state auditor for the issuance of the warrants, and their registration, on presentation to the state treasurer, for lack of funds, as provided by law. The claims thus presented were for commodities purchased by the state, and such purchase differs from a purchase made by an individual only in detail.

It is incontrovertible that, when an individual purchases goods or labor from another, with no mention of time of payment, or in fact of payment itself, such purchase carries with it an implied promise to pay therefor. The time of payment may be regulated by custom, or the implied promise may be to pay within a reasonable time. When the state, acting through its proper officers, purchased the commodities for which eventually these warrants were issued, the state impliedly promised to pay therefor just as much as would an individual under like circumstances. As the state is presumed to do business through its officers by the method above referred to, these warrants, while providing no time of payment, carry the implied promise that they will be paid on presentation at the office of the treasurer, or, at most, as soon thereafter as funds are available.

Webster's New International Dictionary defines a "debt" as "that which is due from one person to another whether money, goods or services; that which one person is bound to pay to another, or to perform for his benefit; things owed, obligations, liability." This definition does not contain the element of time of payment, included in the defini-

tion submitted by relator, and we consider it the better definition of the word.

It is admitted by relator that the treasury notes, if issued, will constitute evidence of indebtedness; in fact, he strenuously contends that this is so, and that therefore the Act [13] changes the position of the state as to its obligation, if an obligation exists. But this contention has been foreclosed in this state. In the case of *State ex rel. Rankin* v. *Board of Examiners,* above, in answering a like assertion, this court said: "These treasury notes authorized by the Act stand in no different position as an obligation of the state than registered warrants," *etc.*

(c) It being then beyond controversy that the state is [14] indebted to the holders of the warrants under consideration, and that these warrants are evidence of indebtedness, and that the Act provides for the refunding of the exact amount represented by the warrants, not at an increased but at a decreased rate of interest, does the Act "create" a debt within the meaning of this provision of the Constitution?

This question has also been answered by this court. Mr. Justice Holloway, speaking for the court in the case of *Edwards* v. *Lewis and Clark County,* 53 Mont. 359, 165 Pac. 297, in construing a like provision regarding county indebtedness, said: "The terms 'incur indebtedness or liability' * * * are not synonymous with the term 'borrow money.' * * * It is apparent to any one that the indebtedness represented by the road warrants will not be discharged by issuing bonds and from the proceeds paying off the warrants and that no new indebtedness will be incurred. The indebtedness will remain but the evidence of it will be changed from the warrants to the bonds. The transaction is not unlike that of the individual who gives his note for an indebtedness represented by a due bill or open account, or who borrows from A. to pay B. The indebtedness still exists though it may be evidenced by a

different instrument, payable to a different creditor or more effectively secured. * * * No new indebtedness will be incurred." (See, also, *Palmer* v. *City of Helena,* 19 Mont. 61, 47 Pac. 209; *Hotchkiss* v. *Marion,* 12 Mont. 218, 29 Pac. 821.)

So, here, the indebtedness was created by the purchases made, coupled with the implied promise to pay; it was originally evidenced by the open account; changed to that form when the warrants were issued; and it is now proposed merely to change the evidence of the indebtedness from warrants to treasury notes.

(d) But it is contended that as the indebtedness evi-
[15] denced by these registered warrants so far exceeds the constitutional limitation, the warrants were illegally issued, and are therefore void and constitute no valid debt.

On this contention it must be remembered that the allegation is that these warrants all bear six per cent interest. The indebtedness has been accumulating for more than ten years last past. Now, section 180, Revised Codes of 1921, provides that warrants registered up to January 1, 1922, shall bear interest at the rate of seven per cent and those registered thereafter shall bear interest at the rate of four per cent. This section was amended March 12, 1923, by Chapter 159 of the Laws of 1923 by changing the rate of interest to six per cent and this chapter was, in turn, amended by Chapter 111 of the Laws of 1925 by making the rate after April 1, 1925, four and a half per cent.

Section 183, Revised Codes of 1921, with the section just referred to, requires the calling of all registered warrants as funds for their payment are available and the payment thereof in order of their registration. It is therefore apparent that, if these are all six per cent warrants, the accumulation of past years was taken up after March 12, 1923, and current expense warrants for the past two years registered in their stead. It also appears that for the fiscal year ending June 30, 1923, the income exceeded the expendi-

tures, while for the succeeding year the expenditures exceeded the income by less than the constitutional limitation of indebtedness. Thus, while the indebtedness is the result of an accumulation of years, the warrants under consideration are all evidences of indebtedness incurred for the proper and legitimate current expense of the state government necessarily incurred during the past two years in order that the government might continue to function. In other words, as suggested by relator, during the past two years the payment of the current and necessary expenses of the state has been deferred by reason of the fact that the state was forced to pay for ''dead horses,'' and in spite of the fact that had this accumulation not existed every one of these warrants could have been paid or registered without even a technical violation of this provision of the Constitution. To now say that these current expense warrants are invalid because of the fact that, in past years, the expenditures of the state exceeded in each year the ultimate income, no matter what might have been the anticipated income, would be to say to those with whom the state customarily trades: ''We will take your goods and your services, and, if at the time you present your claims there are funds in the treasury to meet the payment, we will pay for them; if not, we will repudiate the debt.'' It would require those with whom we attempt to trade to ascertain, before extending credit to the state, not whether there are funds in the treasury, but whether there will be funds in the treasury at the time the state board acts upon their claims. It would not only cripple the credit of the state, but would be morally reprehensible— a repudiation of a just liability on a technicality. To take such a position would be intolerable.

Owing to human imperfection, society requires constant and vigilant supervision and control. The state was created for the protection and preservation of life, liberty and property, and that its people might be secure in the exercise of their natural and inalienable rights, and for the proper func-

tioning of the state government it is necessary that various offices and commissions discharge their several powers and duties without remission or interruption; that schools, benevolent and penal institutions be perpetually maintained. "The laborer is worthy of his hire," and those who furnish supplies are not engaged in a philanthropic enterprise. Regardless of temporary financial stringency, expenses of government continue from day to day and from year to year with little variation, and these fixed charges must be provided for and met, or the legislative, judicial and executive officers of the state must abdicate to the destruction of the state and a return to chaos. For these reasons courts have generally held that it was never the intention of the framers of the Constitution, nor of the people in its adoption, that the provisions of the Constitution, common to all state Constitutions, should not, and of necessity it does not, apply to the ordinary and necessary current expenses of state government.

A like situation to that in which this state finds itself arose in Oklahoma in the year 1912, and was met in like manner, except that the Oklahoma legislature proposed to issue bonds for the refunding of something over $2,000,000 indebtedness, evidenced by outstanding warrants. Their constitutional provision was similar to ours, the limitation of indebtedness being $400,000. The same contention was there made as is here made by relator. The supreme court of Oklahoma, in *Re Application of the State to Issue Bonds to Fund Indebtedness,* 33 Okl. 797, 127 Pac. 1065, in holding the outstanding warrants were valid because of their issuance for current expenses and that the refunding thereof did not "create an indebtedness," said: "Whether the issuance of the proposed bonds is in violation of the section of the Constitution invoked depends upon whether or not issuing warrants or the incurring of obligations for the payment of the ordinary current expenses of maintaining the state government against legislative appropriations therefor,

and within the estimated amount of the current revenues of
the state, provided for the year in which the warrants are
issued, is the creation of an indebtedness within the mean-
ing of that section. * * * The contention made here by
those opposing the issuance of bonds, boldly stated, and
stripped of its verbiage, is in its legitimate effect that all
the outstanding warrants of the state, no matter for what
purpose issued, in excess of the limit named in section 23,
Article X, are void, and that, therefore, the state, not owing
them, cannot issue bonds to pay them, as that would be
the creation of a debt in violation of said limitation. If
the state does not owe them already, or rather the sums
they represent, then the contention is sound. On the other
hand, if these warrants were issued legally, * * * and
represented valid obligations in their inception, * * * and
the mere fact that, without fraud, and contrary to the
reasonable provisions made by the officers for revenue, and
contrary to their honest expectations, a failure of the antici-
pated and provided revenue prevents their payment—then
can it be said that section 23, not operative at the time of
their issue, becomes operative now, and makes that now
invalid which when issued was valid?" The court then held
that, while the section, read alone, was capable of such con-
struction, it was not the intention of the framers of the
Constitution that it should apply to such expenditures. To
the same effect are the holdings in *Rhea* v. *Newman,* 153
Ky. 604, 44 L. R. A. (n. s.) 989, 156 S. W. 154; *Hager* v.
*Gast,* 119 Ky. 507, 84 S. W. 557; *State ex rel. Ross* v. *Dona-
hey,* 93 Ohio St. 414, 113 N. E. 263; *Carter* v. *Thorson,* 5
S. D. 474, 49 Am. St. Rep. 893, 24 L. R. A. 734, 59 N. W.
469. As stated in *Rhea* v. *Newman,* above: "Clearly, the
conclusion reached * * * that the prohibition of section
49 did not embrace the ordinary expenses of the govern-
ment, is sound, since, under no view of the case, can it be
believed that the convention ever contemplated that a state
of affairs could arise where the state government must stop

for want of cash to pay the ordinary expenses of the government."

These warrants evidence a valid outstanding indebtedness of the state, both morally and legally binding upon us, and must be paid in some manner, whether it be in the manner provided by law for the payment of registered warrants or in the manner provided in this Act. This is the interpretation of our Constitution "by the spirit which vivifies and not by the letter which killeth." (*Downes* v. *Bidwell*, 182 U. S. 244, 45 L. Ed. 1088, 21 Sup. Ct. Rep. 770 [see, also, Rose's U. S. Notes].)

6. Finally, it is contended that, aside from the constitutional [16] considerations, the Act is so inherently indefinite and uncertain that it cannot be enforced.

As heretofore seen, section 2 of the Act provides for the issuance of these treasury notes in series of not less than $1,000,000 each. Section 3 provides that the interest shall be payable semi-annually, in January and July of each year. Section 6 then provides that so much of the moneys accruing to the general fund as will be equal to the amount due in principal and interest at any interest period is set apart to the "Treasury Note Redemption Fund," and provides that these apportionments shall be made semi-annually, and only in such amounts as shall be necessary to meet the semi-annual charges.

Relator contends that this latter section contains conflicting provisions; one commanding the setting aside moneys accruing as they accrue, the other requiring apportionment semi-annually. Courts will not declare a statute void for uncertainty, if it is possible to ascertain the meaning of the Act and give it an intelligible construction, or "if any sort of practical or sensible construction may be given it." (*Adams* v. *Greene*, 182 Ky. 504, 206 S. W. 759; *State ex rel. Forchheimer* v. *LeBlond*, 108 Ohio St. 41, 140 N. E. 491; *Coggins* v. *Ely*, 23 Ariz. 155, 202 Pac. 391.)

The Act under consideration is not unintelligible; it declares that sufficient of the income of the state accruing to the general fund is apportioned to and set aside in the "Treasury Note Redemption Fund" to pay the principal and interest on the treasury notes at each payment date, and requires the state treasurer to take note thereof and to make the apportionment semi-annually. The treasurer will know in advance how much is necessary for this purpose. It is the first charge against the income of the state as it accrues to the general fund. The treasurer will also know in advance what amount will accrue to the general fund before the end of each semi-annual period, and govern his dispensation of the income accordingly.

But relator asks the question: If these treasury notes are to be paid out of the general fund during the next two years, what is to be done regarding the current expenses of the state for that period? Our answer to this question is that the Act does not call for any payment during that period which would not be made had the Act not been passed, and that the treasurer will proceed, as he has in the past, to pay current expense warrants so long as funds are available, and then register warrants presented, in the manner provided by law.

The demurrer to the complaint is therefore sustained, and as it appears that the relator cannot plead to further effect, a decree of dismissal must be entered. So ordered.

*Dismissed.*

ASSOCIATE JUSTICES HOLLOWAY, GALEN and STARK concur.

MR. CHIEF JUSTICE CALLAWAY, being absent on account of illness, did not hear the argument and takes no part in the foregoing decision.