STATE EX REL. DIEDERICHS, RELATOR, v. BOARD OF TRUSTEES OF MISSOULA COUNTY HIGH SCHOOL ET AL., RESPONDENTS.

(No. 6,956.)

(Submitted January 11, 1932. Decided January 22, 1932.)

[7 Pac. (2d) 543.]

*Mr. Howard Toole,* for Relator, submitted a brief and argued the cause orally.

*Mr. L. A. Foot,* Attorney General, *Mr. C. N. Davidson,* Assistant Attorney General, and *Mr. Donovan Worden,* County Attorney of the County of Missoula, for Respondents, submitted a brief; *Mr. Davidson* and *Mr. Worden* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

This is an original proceeding in injunction. Upon an order to show cause, the respondent board appeared and filed a motion to quash, together with an answer. There being no dispute as to the facts, the cause was regularly argued and presented for decision. Succinctly stated, the essential facts are that Missoula county is a county of the fourth class having a population of between 21,000 and 22,000 people, and for many years past it has conducted and maintained a county high school. During the period from May 1, 1918, to July 1, 1930, the county legally issued and sold bonds for high school building construction and equipment aggregating $425,000. From time to time payments have been made on this indebtedness until the principal amount thereof is now reduced to about $350,000. None of the bonds can be paid

or retired until they become due or redeemable and all are interest bearing. With the money so obtained, and with the approval of the qualified electors, a high school building was erected upon a site owned by the county within the city limits of Missoula on the corner of South Higgins Avenue and Eddy Avenue. The building was constructed in four units, as a result of as many bond issues voted by the people; the first being authorized May 1, 1918, and the last in July, 1930. The building having been completed, the board of school trustees duly insured it as against loss or damage by fire or water, which insurance policies were in force and effect on September 15, 1931, when a ruinous fire occurred. Thereafter an adjustment was made with the fire insurance companies which had issued the policies, as a result of which the school board received the sum of $226,101.10 to cover damages to the building, and the sum of $22,642 to cover the loss of equipment, which sums of money, together with $5,000 representing an unexpended portion of the last bond issue for building purposes, is now held by the county treasurer to the credit of the building fund of the Missoula county high school. On the adjustment it was agreed that there is a salvage in the building of the value of $52,000, consisting of the undamaged portions of the building, which include the basement, basement walls and floors, heating plant, the main floor, and such portions above the ground as may be utilized in reconstruction. There was regularly built and used in connection with the main building destroyed by fire, and as a part of it, a gymnasium located on Eddy Avenue across the street from the high school building, which still stands undamaged, and is not herein involved. At the time of the fire, there were about 1,115 students enrolled and attending school in the building, since which time those remaining, 1,055, have been housed for schooling purposes at different places widely scattered in the city of Missoula, with added expense and great inconvenience.

The respondents now propose to expend this money in the county treasury, and no more, for the purpose of rebuilding

the building damaged by fire and to replace the equipment destroyed for high school purposes, aggregating $253,652.10. Under the plans and specifications which have been prepared, a very substantial portion of the burned structure is to be used without alteration. The outer walls, three stories high, the partitions, foundations, heating plant, and various service connections, many window frames and sash and some doors, will be used as they now are in the structure when it is rebuilt, and the building will be the same in architecture and design, floor space, and arrangement of halls and rooms as before the fire; the only material change under the plans is the substitution of concrete construction for the floors and roof.

The proposed expenditure of the money by the board in reconstruction of the high school building is objected to, and in this proceeding it is sought to enjoin the board from so doing without first submitting to the qualified electors the question as to whether the money in the county treasury shall be so utilized and obtaining their approval by a majority vote. The relator's case is predicated upon the provisions of section 5 of Article XIII, of our Constitution, which provides that: "No county shall incur any indebtedness or liability for any single purpose to an amount exceeding ten thousand dollars ($10,000) without the approval of a majority of the electors thereof, voting at an election to be provided by law."

In 1899 the legislature made provision for the establishment of free county high schools by a vote of the electors of any county, for which trustees were to be appointed by the board of county commissioners, and they were empowered to "bond the county" for the purpose of building and equipping a county high school building. (Laws 1899, p. 59.) This Act was amended from time to time until the last meeting of the legislature in 1931, when a complete new code relating to both county and district high schools was enacted (Chap. 148, Laws of 1931; *State ex rel. Henderson v. Dawson County,* 87 Mont. 122, 286 Pac. 125), but counties were by the Act deprived of power to create county high schools by reason of

the specific repeal of section 1262, Revised Codes, 1921. Nevertheless, provision is made for the conduct of high schools already created as county institutions. Sections 88, 89, and 90 provide that the board of county commissioners shall levy a tax for their operation and maintenance; and section 16 provides: "All bonds authorized and issued in accordance with this chapter shall be paid, both principal and interest, in the manner provided by law for the payment of other bonds of counties of the State." The board of school trustees is given express authority to provide by contract for all necessary school supplies, furniture, furnishings, and equipment, and for the repair of high school buildings and property; "but the board shall exercise no power whatsoever conferred upon it by this subdivision whereby obligations are assumed or an indebtedness created in excess of the funds on hand, belonging to the high school, and not otherwise appropriated, or available to the board from the collection of taxes actually levied for the current year, or from the sale of bonds already subscribed." (Subd. 2, sec. 83, Laws of 1931.) By section 92 of this Act it is provided that "the moneys apportioned to any school district or county high school under this chapter shall be held by the county treasurer of the county to the credit of the school district or county high school as its high school fund, and distinct from all other public moneys; disbursements therefrom shall be made for high school purposes only by warrant specifying on its face the consideration for which it is issued."

In application of the intent and purpose of the constitutional limitation contained in section 2 of Article XIII of our Constitution, similar to language employed in section 5 of Article XIII, now under consideration, we made observations which are here equally pertinent, in the case of *State ex rel. Diederichs* v. *State Highway Com.*, 89 Mont. 205, 296 Pac. 1033, 1035, as follows: "Knowing the tendency of governments to run in debt, to incur liabilities, and thereby to affect the faith and credit of the state in matters of finance, thus imposing additional burdens upon the taxpaying public, the

framers of the Constitution placed positive limitations upon the power of the Legislative Assembly to incur a debt or impose a liability upon the state beyond the limit prescribed, without referring the proposition to the electorate for its approval. As to this, the comprehensive language of the section leaves no doubt.''

But does the expenditure in this instance create an indebtedness or liability, thus imposing added burdens on the taxpayers? We think not. Webster defines the word ''indebtedness'' as a ''state of being indebted,'' ''indebted'' as ''brought into debt; being under obligation, held to payment or requital; in debt;'' and ''debt'' as ''that which is due from one person to another, whether money, goods or services; that which a person is bound to pay to another, or to perform for his benefit; thing owed; obligation, liability''; a ''liability'' as the ''state or quality of being liable; as the liability of an insurer; that which one is under obligation to pay, or for which one is liable. One's pecuniary obligations, or debts collectively; opposed to assets.'' ''Liability'' is a much broader term than the word ''debt,'' and is of large and comprehensive significance. In a broad sense it means an obligation one is bound in law or justice to perform. That the language employed in this constitutional provision was for a definite purpose and was used advisedly there can be no doubt. (*State ex rel. Diederichs* v. *State Highway Com.*, supra.) Here no indebtedness or liability is to be created. The funds are on hand for building purposes already approved by the electors.

In the case of *State ex rel. Rankin* v. *Board of Examiners*, 59 Mont. 557, 197 Pac. 988, 992, involving the issuance of treasury notes of the state for the payment of outstanding claims against the general fund, we had a similar question before us, in so far as it relates to *debts and liabilities* of the state, under the provisions of section 2 of Article XIII of our Constitution, above adverted to. In applying this limitation of the Constitution, it was by this court said: ''In construing our constitutional provision applicable, we have under consideration the meaning of the words 'debt or liability,' and in our view

the prohibition intended by these words is the creation of a debt or obligation of the state in excess of cash on hand and revenue provided for," and we there held that this constitutional limitation "has reference to such a liability as singly or in the aggregate will obligate the state to an amount in excess of $100,000 over and above cash on hand and revenues having a potential existence by virtue of existing revenue laws. * * * Clearly the * * * debts prohibited by the Constitution in excess of $100,000 without majority approval of the people at a general election are such as pass the limit of available cash on hand and revenue for which adequate provision has been made by law." And there is no good reason why a different meaning should be placed upon the words "indebtedness" or "liability" as employed in section 5 of Article XIII, placing limitations upon the creation of debts or obligations by the several counties of the state. No provision of law has been made for submitting to the electors the question of the *expenditure of cash on hand,* raised for a definite purpose, in excess of $10,000; and by the lawmakers this constitutional restriction has been interpreted as a restriction upon the borrowing of money, as by statute a method is provided for the manner of submitting to the people the question of borrowing money in excess of $10,000. (Secs. 4717 to 4722; also, sec. 4712, Rev. Codes 1921.)

Here the indebtedness incurred for a county high school building by the issuance of the bonds was regularly approved by the people, and the indebtedness so incurred is drawing interest. In consequence of the fire, the county is now without benefit. The fire converted the building into money available only for the reconstruction of the high school, and consequently, since the original purpose has been given approval by the electors, there is now no useful purpose to be subserved by again submitting the question of the proposed expenditure to the people for approval, nor does the Constitution or law require it.

The only object for insuring the building was to provide for its repair or replacement in the event of fire. In other words, to guarantee to the people the building for county high school

purposes for which they had already authorized a county indebtedness by the issuance of bonds, without additional burden by taxation or otherwise. The insurance money collected is now in the county treasury, representative of the amount of damages sustained by the building in consequence of the fire, and it, together with the remaining $5,000 of the bond issue voted by the people in 1930, constitutes a trust fund held specifically for high school building and equipment purposes, and none other. (*Adams* v. *Helms,* 95 Miss. 211, 48 South. 290.)

It seems plain that the constitutional limitation does not apply to the expenditure of cash on hand provided for a specific purpose; but rather to the creation of an obligation to be met and paid in the future by the taxpayers. (*Falls City Const. Co.* v. *Fiscal Court,* 160 Ky. 623, 170 S. W. 26; *Boettcher* v. *McDowall,* 43 N. D. 178, 174 N. W. 759.)

In our opinion, a liability such as is here contemplated, payable solely from money in the treasury to the credit of a special fund which cannot be used for any other purpose than the construction of a high school building and equipment therefor, is not *incurring an indebtedness or a liability* of the county within the meaning of this constitutional restriction. Limitations of the amount of a debt or liability of a county were never intended to prohibit the expenditure of cash on hand usable only for a designated purpose already approved by the people. Had the framers of the Constitution so intended, the word "expenditure" would have been used as in section 12 of Article XII. The county does not create a debt or liability within the meaning of this constitutional limit where the payment is to be made from funds already provided. (15 C. J., p. 578.) It was the manifest intention of the framers of our Constitution that the people shall not be burdened by taxation with the payment of an indebtedness or obligation to be created over and above funds already provided without first being by them approved.

The case of *Panchot* v. *Leet,* 50 Mont. 314, 146 Pac. 927, 929, upon which the relator places his principal reliance, is very

clearly distinguishable from the case now before us. In that case, it was proposed to impose a property tax levy which would raise in excess of $40,000, and to expend the same in the purchase of a building site and the erection of a high school building without first obtaining a vote of the electors of the county approving such expenditure, notwithstanding the fact that the qualified electors had voted against a proposed bond issue to the amount of $50,000 for the same purpose. In construing the effect of this constitutional limitation, the court very properly said: "The object of the levy in question, therefore, is to raise funds for a county purpose, which can be carried out only by contract. In other words, a liability is to be incurred which, in the end, is to involve an expenditure in excess of $40,000. To say that such a transaction does not require the previous authorization of the people is to ignore the plain language of the constitutional provision above recited."

In the instant case, the funds have been raised and are in the county treasury intact, resulting from the collection of insurance upon a building damaged by fire which was erected from bonds issued upon a majority vote of the people and used for the specific purpose of building the county high school and from moneys left in the treasury unexpended from a bond issue voted by the people for building purposes. The fire has resulted in reconverting the building into money. Instead of the building, the county now holds the ruins of the building and the insurance money collected, while interest on the bonded indebtedness continues against the county with no returns from the investment, and in the meantime, until the building is reconstructed, the county is put to expense and inconvenience in maintaining its high school. The expenditure has already been duly authorized, and to now utilize the funds in rebuilding is, in our opinion, in no manner violative of the constitutional provision above mentioned. No new debt or liability is to be created in excess of $10,000, but rather funds resulting from bonds voted by the people for the given single purpose of erecting a county high school

building, and providing equipment, approved by the electors, are now proposed to be expended for that purpose and no other.

Here it is to be noted that the specific inhibition found in the statute (sec. 16, Chap. 148, Laws 1931) against the expenditure of funds raised from the sale of bonds for county high school purposes is that the board shall exercise no power whatsoever whereby obligations are assumed or an indebtedness is created *in excess of the funds on hand,* belonging to the high school, or available to the board from the collection of taxes actually levied for the current years, or from the sale of bonds already authorized. It is clear that it is not proposed to violate the statute, as the funds are now on hand.

Upon the hearing, the relator very properly withdrew objection to the expenditure of the $5,000 raised from the bond sale in 1930 for high school building purposes, yet remaining unexpended. In our opinion, the insurance money is in like status, and may be expended for the purpose now contemplated without again submitting the question to a vote of the electors, and therefore the writ is denied.

Writ denied.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES FORD, ANGSTMAN and MATTHEWS concur.