GRAHAM, PLAINTIFF, *v.* STATE BOARD OF EXAMINERS
ET AL., DEFENDANTS.

(No. 8586.)

(Submitted February 2, 1945. Decided February 10, 1945.)

[155 Pac. (2d) 956.]

586

*Mr. Wellington D. Rankin* and *Mr. Arthur P. Acher,* for Plaintiff, submitted a brief; *Mr. Rankin* aruged the cause orally.

*Mr. R. V. Bottomly,* Attorney General and *Mr. Clarence Hanley,* Assistant Attorney General, for Defendants, submitted a brief; *Mr. Hanley* argued the cause orally.

Defendant *Sam C. Ford,* Governor and one of defendants, filed a separate brief and argued the cause orally.

*Mr. T. H. Burke, amicus curiae,* argued the cause orally.

### OPINION: PER CURIAM.

This action is brought against the Board of Examiners of the State of Montana and the members thereof. The prayer of the complaint is for a declaratory judgment of this court declaring and determining that House Bill No. 45, [Chapter 2] Session Laws of Montana, 1945, is a valid legislative enactment and declaring the duties of the defendants under said bill authorizing and requiring the defendants to employ an architect or architects for the purpose of preparing plans and specifications as in said Act provided.

House bill No. 45, as duly passed by the 29th Legislative Assembly of the State of Montana, after setting forth a declaration of policy not here pertinent, provides:

"Section 3. There is hereby appropriated out of the unexpended surplus moneys at present in the general fund of the

State of Montana, the sum of thirty thousand dollars ($30,-000.00) or such part thereof as may be necessary to pay said architect or architects in compliance with the provisions of this Act. It is, however, expressly declared, and this provision is mandatory, that said sum of thirty thousand dollars ($30,000.00) or such part thereof as is necessary shall be paid only out of the present surplus in the general fund of the State, and no part of said money which may be taken from the surplus in said general fund shall be replaced by any money derived from any tax levy which may hereafter be made by the Legislative Assembly.

"No part of the funds derived from any tax levy provided for by Section 12 of Article XII of the Constitution of Montana, which has been or may hereafter be levied by this Session of the Legislative Assembly shall be used to pay such appropriation or any part thereof."

The question presented is whether the Act conflicts with section 12 of Article XII of the Montana Constitution, which provides as follows: "No appropriation shall be made nor any expenditures authorized by the legislative assembly whereby the expenditures of the state during any fiscal year shall exceed the total tax then provided for by law, and applicable to such appropriation or expenditure, unless the legislative assembly making such appropriation shall provide for levying a sufficient tax, not exceeding the rate allowed in section nine (9) of this Article, to pay such appropriations or expenditures * * *. This provision shall not apply to appropriations or expenditures to suppress insurrection, defend the state, or assist in defending the United States in time of war. No appropriation of public moneys shall be made for a longer term than two years."

In the construction of this section, as in other constitutional and statutory enactments, the duty of this court is to ascertain the real intention of the framers of the enactment.

This court has held in numerous cases that in considering the constitutionality of an Act of the legislature the Act will be upheld unless its unconstitutionality appears beyond a reasonable doubt. Thus the rule announced in *State ex rel. Tipton* v.

*Erickson*, 93 Mont. 466, 19 Pac. (2d) 227, 228: ''In the determination of the question of the constitutionality of any Act, a statute, if possible, will be construed so as to render it valid. (*Hale* v. *County Treasurer*, 82 Mont. 98, 265 Pac. 6.) It is presumed to be constitutional, and all doubts will be resolved in favor of its validity if it is possible so to do. (*State ex rel. Toomey* v. *Board of Examiners*, 74 Mont. 1, 238 Pac. 316, 320.) The invalidity of a statute must be shown beyond a reasonable doubt before the court will declare it to be unconstitutional. (*Herrin* v. *Erickson*, 90 Mont. 259, 2 Pac. (2d) 296.) A statute will not be held unconstitutional unless its violation of the fundamental law is clear and palpable. (*Hill* v. *Rae*, 52 Mont. 378, 158 Pac. 826, L. R. A. 1917A, 495, Ann. Cas. 1917E, 210;'' *Henderson* v. *City of Missoula*, 106 Mont. 596, 79 Pac. (2d) 547, 116 A. L. R. 1425.)

A consideration of the language used in section 12 and of ▉ the other sections of Article XII which have to do with revenue and taxation, and of discussions among the members of the constitutional convention with reference to these subjects, leads to the conclusion that the purpose of this section was to prevent the legislative assembly from plunging the state into debt by the appropriation of money or the incurring of obligations for the payment of which sufficient funds are not made available. It is argued by plaintiff and at least one member of the Board of Examiners that such was the intention of the framers of the Constitution, and that it was never anticipated by them that the general fund of the state might contain a surplus, and that therefore the intention of the enactment would not be served by a ruling that a surplus accumulated by design, or otherwise, could not be spent by the legislature.

We must determine then what was intended by the constitutional convention in providing that no appropriation shall be made or expenditures authorized whereby the expenditures of the state during any fiscal year shall exceed ''the total tax then provided for by law, and applicable to such appropriation or expenditure * * *.''

What did the convention contemplate should be included in "the total tax then provided for by law, and applicable to such appropriation or expenditure"? It is argued that the words "total tax" must be strictly construed to mean a tax provided for by the legislative assembly and that appropriations may not be made in excess of the amount of anticipated revenue from taxation for the fiscal year regardless of any surplus in the general fund over and above the amount of anticipated revenue for that year. This court has taken judicial notice of the fact that, under the practice in effect in this state, moneys from sources other than taxes are deposited in the general fund, such as fees collected by various state agencies. It is obvious also that it is impossible for the assembly to anticipate with any accuracy the amount of such fees or in fact the amount of taxes, other than *ad valorem* taxes, which may be collected during any fiscal year.

This court has construed the meaning of this section as applicable to the question here involved. The case of *State ex rel. Toomey* v. *State Board of Examiners,* 74 Mont. 1, 238 Pac. 316, 321, was brought to enjoin the Board of Examiners from carrying into execution the provisions of Chapter 176, Laws of 1925, providing for the issuance and sale of state treasury notes for the purpose of refunding certain outstanding state warrants for the payment of which there was no money available in the general fund. One of the points raised by the relator was that the Act violated the section here under consideration. Mr. Justice Matthews, speaking for the Court, with reference to this objection said:

"Relator next contends that the Act violates section 12, Article XII of the Constitution, which in so far as applicable to the objection raised, reads: 'No appropriation shall be made nor any expenditures authorized by the Legislative Assembly whereby the expenditures of the state during any fiscal year shall exceed the total tax then provided for by law, and applicable to such appropriation or expenditure, unless the Legislative Assembly making such appropriation shall provide for levying a

sufficient tax, not exceeding the rate allowed in section nine (9) of this Article, to pay such appropriations or expenditures within such fiscal year.'

"The contention now under consideration is that the Act challenged appropriates the sum of $3,750,000, which, with other appropriations, authorizes expenditures during the fiscal years ending June 30, 1926, and June 30, 1927, of over $1,000,000 in excess of the total tax provided by law for those fiscal years.

"While the provision above seems to limit such appropriations or expenditures to the 'total tax,' the legitimate appropriations and expenditures cover the anticipated income from all sources, subject to appropriation. In *Fergus* v. *Brady*, 277 Ill. 272, 115 N. E. 393, Ann. Cas. 1918B, 220, this fact is made clear by the following statement: 'There is a very large amount of money paid into the state treasury from other sources than direct taxation, and the ordinary meaning of the word is the total income of the government, derived from all sources, subject to be applied to public purposes. It would not be reasonable to say that appropriations which are not to exceed income should be limited to moneys raised by direct taxation while there are large sums of money which may be applied to the purposes of the government not taken into account.' That this is the rule to be applied is impliedly admitted by relator in his complaint, wherein reference is made to the receipt from the *ad valorem* tax and from license and inheritance taxes.

"That the provision should be interpreted to refer not only to the income from all available sources, but also to anticipated income, has been declared by this court in *State ex rel. Bennett* v. *Board of Examiners*, 40 Mont. 59, 104 Pac. 1055, where it is said: 'The limitation is addressed to the legislature itself, the taxing body, exclusively. * * * It is compelled to act upon the facts at hand and conditions determinable from the circumstances as they exist. It cannot be required to anticipate all the conditions which may possibly arise in the interim; nor may it, in attempting to anticipate supposed contingencies, incorporate in its Acts such conditions and provisions as will render it im-

possible for the disbursing officers to carry forward the business of the government.' '' (See also *State ex rel. Rankin* v. *State Board of Examiners,* 59 Mont. 557, 197 Pac. 988.) While this case deals with a different section of the Constitution, it is persuasive of the conclusion that the constitutional convention, in limiting expenditures or indebtedness by the legislature, contemplated that such limitation should take into consideration cash on hand as well as anticipated revenue. (*State* v. *Board of Trustees,* 91 Mont. 300, 7 Pac. (2d) 543; *Henderson* v. *People ex rel. Wingate,* 17 Colo. 581, 31 Pac. 333.)

With these rules of construction in mind, let us examine the wording of section 12 which restricts the amount of money which may be appropriated by the legislature for any fiscal year. In the first place, there appears to be no express constitutional prohibition against the appropriation of monies in the general fund, so that it must be presumed that these monies, unless otherwise appropriated, are applicable ''to such appropriation or expenditure.'' But, in addition to being applicable to appropriation, the funds to be appropriated shall not exceed the total tax then provided for by law. We hold that the words ''total tax'' mean, and were intended by the framers of the Constitution to mean, not only revenue from taxes but all forms of revenue derived by the state from any source which might be used to defray the expense of the state government. To hold otherwise would be to create a situation whereby the state would have in its possession large sums of money which it could not spend; in other words, a surplus which could not be applied to payment of the expense of state government or for any other state purpose. It does not seem reasonable to assume that a state with a large surplus in its treasury would still be restricted in its appropriations for state purposes to taxes to be raised during a current fiscal year. In order to so construe the meaning of section 12, we would further have to decide that ''the total tax then provided for by law'' refers to taxes levied and raised during the fiscal year for which the appropriations are made. We hold that such a construction is not justified. Money col-

lected and held in the general fund is derived from taxes, as well as from other sources provided by law, whether during the current fiscal year or not.

We think that the meaning of section 12, Article XII of the Constitution is that no appropriation shall be made nor any expenditure authorized by the legislative assembly whereby the expenditures of the state during any fiscal year shall exceed the total of funds available, and applicable to such appropriation or expenditure; and further that the funds available for such purpose include not only funds in the treasury, not otherwise appropriated, but also monies to be derived from taxes and other sources provided for by the legislative assembly for such year.

Section 16, Art. 10 of the Colorado Constitution contains a provision practically identical with our section 12, which has been several times construed by the supreme court of that state. While the questions before the court were not identical with that now under consideration, we feel that they furnish support for our conclusion. In the early case of *In re Appropriations by General Assembly,* 13 Colo. 316, 22 Pac. 464, 466, that court said in construing that section: ''By said section 16, each and every general assembly is inhibited in absolute and unqualified terms, from making appropriations or authorizing expenditures of the former class in excess of the total tax then provided by law and applicable for such appropriation or expenditure, unless such general assembly shall provide for levying a sufficient tax, within constitutional limits, to pay the same within such fiscal year. This language needs no construction. It is plain, simple, and unambiguous. It need not be misunderstood. It cannot be evaded. It means that the state cannot be plunged into debt by unauthorized legislation. If the general assembly pass Acts making such appropriations or authorizing expenditures in excess of constitutional limits, such Acts are void.''

We find it unnecessary to consider whether the project contemplated by House Bill No. 45 comes within the war clause contained in section 12 of Article XII, for the reason that the surplus funds of the state may be appropriated and expended by

the legislature for any purpose it sees fit. The war clause would be involved only if the appropriations exceeded the funds available from all actual and anticipated monies. The contention, too, that it may not be used for current expenses of the state government cannot be sustained, for nothing in the Constitution differentiates between those and any other expenditures.

It has been suggested that even though the surplus is subject to appropriation, it could not be used for the purpose contemplated by House Bill No. 45 without having the approval of the people, if the whole project exceeded $100,000. Reliance is placed upon that part of section 2 of Article XIII of the Constitution, reading: "but no debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred thousand dollars ($100,-000) except in case of war, to repel invasion or suppress insurrection, unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for and against it at such election."

The fallacy of this argument proceeds upon the erroneous premise that a "debt or liability" is created. It has repeatedly been held by this court that there is no debt or liability created when there is cash on hand or revenue provided by the legislature for the biennium to meet the appropriation. (*State ex rel. Rankin* v. *Board of Examiners*, supra; *State ex rel Toomey* v. *State Board of Examiners*, supra; *State ex rel. Veeder* v. *State Board of Education*, 97 Mont. 121, 33 Pac. (2d) 516; *State ex rel. Blume* v. *State Board of Education*, 97 Mont. 371, 34 Pac. (2d) 515; *Willett* v. *State Board of Examiners*, 112 Mont. 317, 115 Pac. (2d) 287.) Other courts take the same view. (*Coos County* v. *Oddy*, 156 Or. 546, 68 Pac. (2d) 1064; *Veterans' Welfare Board* v. *Riley*, 188 Cal. 607, 206 Pac. 631; *Bryan* v. *Menefee*, 21 Okl. 1, 95 Pac. 471; *Crick* v. *Rash*, 190 Ky. 820, 229 S. W. 63; *State ex rel Branch* v. *Leaphart*, 11 S. C. 458.) It is obvious that to write a check against one's funds in a bank is not to incur a debt or liability.

It is fundamental that our Constitution is but a limitation of powers. The legislature may do anything it wishes except and unless it is prohibited from so doing by the Constitution. The appropriation of surplus funds does not create a "debt or liability" and, hence, the question of appropriating more than $100,000 of such surplus need not be submitted to a vote of the people under section 2 of Article XIII. There is no other constitutional provision requiring approval of the people.

Whatever may be said in favor of the right of the people to be heard directly on what a surplus should be expended for, is a subject that addresses itself to the need of a constitutional amendment. There is nothing in the Constitution now that requires it. If that contention should be upheld then it would be necessary to hold that an expenditure of more than $100,000 by the state for the purchase of whiskey for resale to the public would have to be submitted for approval to the vote of the people. Certainly such an expenditure is not for ordinary and current expenses for running the state government. No one has had the hardihood to contend that an expenditure of more than $100,000 for whiskey requires the consent of the people. The reason is obvious. It is purchased with funds on hand and no debt or liability is created. The case of *State ex rel. Diederichs* v. *State Highway Comm.*, 89 Mont. 205, 296 Pac. 1033, so strongly stressed in the dissenting opinion, has nothing to do with the question here being considered. The law involved in that case created a debt or liability in the sum of $6,000,000 and attempted to mortgage the revenues to be anticipated from the gasoline license tax for a period of many years to pay the debt or liability. We agree with everything said in the opinion in that case as applied to the facts under consideration, but those facts have no similarity to those involved in this case.

We hold that the present legislature may legally appropriate from monies in the general fund amounts which in the aggregate will not exceed the amount therein not otherwise appropriated, increased by the amount of revenue anticipated to become available during the fiscal year for which the appropriations are

made. We therefore hold that House Bill No. 45, in so far as it appropriates funds in excess of revenue anticipated for the fiscal years 1945-1946 and 1946-1947, is not objectionable as contravening the Constitution, if there are sufficient funds in the state treasury, not otherwise appropriated, to cover such appropriation.

The plaintiff is therefore entitled to a judgment as prayed for, adjudging that the enactment in question is valid and that it is the duty of the defendants to give full effect thereto. Accordingly it is so adjudged.

MR. JUSTICE ADAIR, dissenting:

A cash surplus of $4,859,500.97 was in the general fund of this state on February 1, 1945. This money has accumulated during the past four years. It is revenue of the state that was paid into the treasury to pay the public debt or defray the general expenses of government. This money was exacted from the people. These exactions have exceeded the needs of the state government for the ostensible purposes for which they were collected by almost five millions of dollars. This money belongs to the people of the state. It was paid *into* the treasury by them for the purpose of defraying the general and ordinary expenses of their government. It is now proposed that this $4,859,500.97 belonging to the people be paid *out* of the treasury.

The people of this state prescribed certain definite and positive limitations on the taking of their money, to pay *into* the treasury, as well as upon the paying of this money *out* of the treasury.

Despite the tuneful appeal of "Don't Fence Me In," the fact remains that the power to raise money by state taxation and the power to appropriate and expend that money after it is raised was, by the framers of our Constitution, very closely fenced in.

The people of this state not only built a hog-tight fence to keep its servants within bounds on the matter of state finances but it attached the constitutional fence to steel posts set in concrete.

Here are some of the anchoring posts provided by our Constitution: (1) The *necessary* revenue for the support and main-

tenance of the state shall be provided by the legislative assembly; (2) taxes shall be levied and collected by general laws and for *public purpose only;* (3) all taxes levied for state purposes shall be paid *into* the state treasury; (4) no money shall be paid *out* of the treasury except upon appropriations made by law; (5) no money shall be *drawn from* the treasury but in pursuance of specific appropriation made by law; (6) the general appropriation bills *shall embrace nothing but appropriations for the ordinary expenses* of the legislative, executive and judicial departments of the state, interest on the public debt and for public schools; (7) all other appropriations shall be made by separate bills, each embracing but one subject; (8) no appropriation of public moneys shall be made for a longer term than two years; (9) the rate of taxation on real and personal property for state purposes shall not exceed two mills on each dollar of valuation *unless the proposition to increase such rate shall have been submitted to the people at the general election* and shall have *received a majority of all votes cast for and against it at such election;* (10) no debt or liability shall be created by the legislative assembly which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of $100,000 *unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for and against it at such election;* (11) no appropriation shall be made by the legislative assembly whereby the expenditures of the state during any fiscal year (i. e. from July 1 to the next June 30) shall exceed the total tax then provided for by law and applicable to such appropriation unless the legislative assembly shall provide for levying a sufficient tax to pay such appropriation within such fiscal year; (12) no expenditures shall be authorized by the legislative assembly whereby the expenditures of the state during any fiscal year shall exceed the total tax then provided for by law and applicable to such expenditure, unless the legislative assembly shall provide for levying a sufficient tax to pay such expenditures during the fiscal year. The only gap in the fence

so built by the framers of our Constitution is at fence posts numbers 10, 11 and 12 above and the gap can exist only for emergency appropriations or expenditures "to suppress insurrection, defend the state or assist in defending the United States in time of war."

A general election is held in this state each two years at which representatives in the legislative assembly are elected for the term of two years and, since no appropriation of public moneys shall be made for a longer term than two years, Article XII, section 12, the Constitution requires that those entrusted with providing for the revenues and expenditures of the state must, each two years, stop, look and listen to the needs of the state so far as concerns its fiscal affairs and management, remembering that the provisions of our Constitution in relation to taxation are not grants of power but are limitations on the taxing power of the state.

By House Bill No. 45, the legislative assembly recognizes and declares that it has a post-war obligation for the care, rehabilitation and employment of its citizens and, "In order that a beginning may be made in translating that *obligation* into performance, the State Board of Examiners is hereby authorized and directed to employ an architect or architects for such period of time as it may deem proper, not exceeding two years from the effective date of this Act, for the purpose of preparing plans and specifications for the construction of a needed office building or addition to the present State Capitol building at Helena."

To discharge the above "obligation" and to pay the architects to be so employed, the bill appropriates $30,000 "out of the unexpended surplus moneys at present in the general fund of the State of Montana."

The appropriation provided for in House Bill No. 45 is not for the purpose of paying any of the regular and ordinary expenses of government but it is for the payment of an expense wholly foreign to the purpose for which the contributors, whose money makes up this surplus, were asked to contribute. To

appropriate and expend the peoples' money for other than the regular and ordinary expenses of government, the questions of purpose and amount should be first submitted to and approved by the people at a general election under section 2 of Article XIII of the Constitution when the contemplated appropriations and expenditures exceed $100,000.

The creation of an obligation payable from these funds is a liability of the state and its effect is to divert a large part of the revenues of the state out of the channel of the ordinary and regular expenditures of running the government when such monies were raised and paid into the treasury for the ostensible purpose to pay the public debt or to defray the general expenses of government, thus relieving the heavy burden of taxes levied upon property. (*State ex rel. Diederichs, Relator* v. *State Highway Commission*, 89 Mont. 205, 296 Pac. 1033, 1034.)

In the case just cited the legislature attempted to authorize the sale of state highway debentures in the sum of $6,000,000. This court held that since the legislative assembly there sought to create a debt or liability in excess of $100,000 same was void under section 2 of Article XIII of the Constitution which requires that the matter first be submitted to and that it receive the approval of the people at a general election.

In its opinion in the *Highway Debenture Case*, supra, this court said:

"It is legislative power, not policy, that is drawn in question. And while we are mindful of the presumptions in favor of legislative Acts, yet, being bound to support, protect, and defend the Constitution, when an enactment transgresses the constitutional limitations beyond a reasonable doubt, it is our solemn and sworn duty to so declare it. We are mindful, too, that the declarations of Constitutions are placed therein to be obeyed, and are not to be frittered away by construction. (*Less* v. *City of Butte*, 28 Mont. 27, 72 Pac. 140, 61 L. R. A. 601, 98 Am. St. Rep. 545), * * *. As stated by that able jurist, Chief Justice Taney of the United States Supreme Court, in the famous Dred Scott decision (*Scott* v. *Sandford*, 19 How. (U. S.) 393, 15 L. Ed.

692) : "No change in public opinion on questions of public policy can ever be given any weight in construing the provisions of a Constitution where the meaning is clear, for the adoption of a Constitution that might be deemed wise at one time and unwise at another would abrogate the judicial character of the court and make it the reflex of the popular opinion or passion of the day." If the Act in question authorizes the creation of a debt or liability in excess of $100,000, there are two available methods of accomplishing what the act proposes: One is to amend the Constitution, and the other is to obtain the consent of the people at an election for that purpose.

"* * * The framers of the Constitution provided two methods of raising revenue for public purposes: One the taxation system, and the other the license system. (*State* v. *Camp Sing,* 18 Mont. 128, 44 Pac. 516, 32 L. R. A. 635, 56 Am. St. Rep. 551.) Knowing the tendency of governments to run in debt, to incur liabilities, and thereby to affect the faith and credit of the state in matters of finance, thus imposing additional burdens upon the taxpaying public, the framers of the Constitution placed positive limitations upon the power of the Legislative Assembly to incur a debt or impose a liability upon the state beyond the limit prescribed, without referring the proposition to the electorate for its approval. As to this, the comprehensive language of the section leaves no doubt. The first two sentences employ the word 'debt' and refer to debt alone, but the third adds the word 'liability,' a much broader term than 'debt.' Liability is a broad term, of large and comprehensive significance. * * * The authors of the Constitution used the term advisedly, with a definite purpose. In construing a constitutional provision it is our duty to give meaning to every word, phrase, clause, and sentence therein, if it is possible so to do. So, whether the law authorizing a contract for the sale of these debentures creates a debt, such as is contemplated by the first two sentences of section 2, is not material. It certainly creates a liability, which includes a debt, for the state is expressly obligated not to reduce the excise taxes on motor fuels fixed by the Twenty-Second

Legislative Assembly and to cause the tax to be collected and paid to the debenture holders. This is prohibited by the plain terms of the Constitution, unless approved by the people.

"The fact that a special fund is created by the imposition of the license or excise tax on motor fuels with which to pay the debentures is of no importance.

"Under this contention the Legislature, or the debt-contracting authority, could divide the public revenue into numerous subdivisions, calling one the 'road fund,' another the 'school fund,' another the 'agricultural fund,' another the 'public health fund,' and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness provided each debt was made payable out of some one of the specially designated funds into which all of the revenue collected by taxation from the people had been divided. A mere statement of the proposition carries with it, it seems to us, its own refutation. (*Crick* v. *Rash*, 190 Ky. 820, 229 S. W. 63.) * * *

"*State ex rel Rankin* v. [*State*] *Board of Examiners*, 59 Mont. 557, 197 Pac. 988, also presented an entirely different situation. In that case the debt or liability was already in existence, represented by outstanding warrants when the treasury notes were issued. The issuance of the treasury notes simply changed the form of the existing indebtedness or liability, and did not create one. (*Hotchkiss* v. *Marion*, 12 Mont. 218. 29 Pac. 821; *Parker* v. *City of Butte*, 58 Mont. 531, 193 Pac. 748; *Edwards* v. *Lewis & Clark County*, 53 Mont. 359, 165 Pac. 297; *State ex rel. Toomey* v. *State Board of Examiners*, 74 Mont. 1, 238 Pac. 316.) * * *

"The creation of an obligation, payable from these funds, is a liability of the state; its effect is to divert a large part of the revenues of the state into the state highway fund for a period of ten years, which otherwise might be used to pay the public debt or to defray the general expenses of the government, thus relieving the heavy burden of taxes levied upon property. * * *

The people are gravely concerned as to how and the purposes for which their money is spent. * * * As the great Justice Story said in the *Dartmouth College Case,* 4 Wheat. (U. S.) 518, 713, 4 L. Ed. 629: 'We have nothing to do but pronounce the law as we find it; and having done this, our justification must be left to the impartial judgment of our country.'

"The upshot is that in order to validate the Act it must receive the approval of the electorate."

It would seem that the money to pay "for the construction of a needed office building or addition to the present State Capitol building at Helena" and for the payment of an architect for the purpose of preparing plans and specifications for such construction should be appropriated from the trust fund provided for that purpose and known as the "State Capitol Building Fund" rather than to be appropriated from the General Fund of the state. If the appropriation were made from the former fund, the restrictions of section 12 of Article XII of the Constitution would not apply, as this court long ago (1896) held, speaking through Mr. Justice Hunt in *State ex rel. Bickford* v. *Cook,* 17 Mont. 529, 43 Pac. 928.

Since the power to appropriate is co-extensive with the power to tax, it is subject to fundamental and inherent limitations. In my opinion, section 12 of Article XII of the Constitution not only limits and restricts appropriations but also authorizations. It does not freeze the surplus monies which are now in the general fund. It merely requires that before over four millions of dollars exacted from the taxpayers and paid into the public treasury for one purpose shall be expended for a wholly different purpose, the taxpayers shall be consulted and that the proposed expenditure be, by the taxpayers, authorized and approved at a general election before the money is spent. The other alternative is that the legislature submit to the taxpayers an amendment to section 12 of Article XII of the Contsitution permiting it to spend the money.

In the meantime, even though we "can't look at hobbles" and though we "can't stand fences," still the fence erected by

the framers of our Constitution stands between us and the appropriating, expending and paying out of the general fund in the public treasury monies in an amount which shall "exceed the total tax then provided for by law, and applicable to such appropriation or expenditure."