No. 12731

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

---

LOUIS YOVETICH, on behalf of himself and all
other residents and property owners in the
County of Yellowstone, State of Montana,
similarly situated,

Plaintiffs and Appellants,

and

STEVE TRENKA and MABEL TRENKA, husband and wife,
CLAYTON ORR, JOHN GLANTZ and MOLLY GLANTZ,
husband and wife et al.,

Plaintiff and Appellant Intervenors,

-vs-

M. E. McCLINTOCK, A.S. ROBERTS et al,

Defendants and Respondents

KOBER CONSTRUCTION COMPANY, Yellowstone Electric
Company, et al.,

Defendant and Respondent Intervenors,

DAVID G. DRUM, WARREN F. VAUGHAN et al.,

Defendant and Respondent Intervenors.

---

Appeal from: District Court of the Thirteenth Judicial District,
Honorable M. James Sorte, Judge presiding.

Counsel of Record:

For Appellants:

Larry D. Herman argued, Laurel, Montana
Ralph Herriott argued, Hysham, Montana

For Respondents:

Harold F. Hanser, County Attorney, argued, Billings
Montana
C. W. Jones argued, Billings, Montana
Anderson, Symmes, Forbes, Peete and Brown, Billings,
Montana
Benjamin N. Forbes argued, Billings, Montana
Crowley, Kilbourne, Hanson and Gallagher, Billings,
Montana
Moulton, Bellingham, Longo and Mather, Billings, Montana
William H. Bellingham argued, Billings, Montana

---

Submitted: June 14, 1974

Decided: AUG 2 9 1974

Filed: AUG 2 9 1974

*Thomas J. Kearney*
Clerk

Mr. Justice John C. Harrison delivered the Opinion of the Court.

This is an appeal from a judgment of the district court of Yellowstone County denying a petition for injunctive or declaratory relief against the Board of County Commissioners, Yellowstone County, for its method of funding the multi-use building presently being constructed at the fairgrounds in Billings, Montana.

The facts disclose that on November 2, 1971, the voters of Yellowstone County approved the sale of general obligation bonds in the sum of $3,000,000 for the purpose of constructing and equipping a multi-use building at the fairgrounds in the City of Billings. The ballot presented to and approved by the voters read:

> "Shall the Board of County Commissioners be authorized to issue, negotiate and sell bonds of the County of Yellowstone in the amount of Three Million Dollars ($3,000.000.00) payable during a period of not to exceed twenty (20) years, redeemable on any interest due date after five (5) years; for the purpose of constructing and equipping a Multi-Use Building at the Midland Empire Fairgrounds, Yellowstone County, Montana, with a seating capacity of at least 10,000 and an arena of approximately 250 feet by 400 feet."

When the bond issue was approved, the county commissioners had no access to a cost estimate of the building based on plans and specifications. In October 1972, the county commissioners employed architects who submitted a schematic design which set forth the size, shape, and cost of the building. The schematic design estimated the total cost of the building to be $3,848,500.

Toward the end of 1972, the county commissioners began to anticipate the receipt of federal revenue sharing funds. Consequently, the county commissioners made some refinements in and broadened the use of the building. These changes plus the

existing severe inflation served to increase the cost of the building beyond the sum originally anticipated by the county commissioners.

Bids for the construction of the multi-use building were opened on November 28, 1973 and contracts were awarded to the defendant-intervenor construction companies on December 27, 1973.

In January 1974, the county commissioners adopted a funding program which projected the cost of the building at $5,880,504.04. Three main sources of funds were to be utilized to meet this obligation:

1. Proceeds from the bond sale and
     interest thereon---                                        $3,528,630.89

2. Principal and interest on fire in-
     surance proceeds resulting from the
     destruction of the previous building---   $  358,591.26

3. Revenue Sharing Funds from the federal
     government, plus interest for entitle-
     ment periods one through six---                   $2,009,188.68

             TOTAL ---                                           $5,896,410.83

Plaintiffs, as taxpayers and residents of Yellowstone County, protested the funding program and set forth three main issues for this Court to consider:

1. Does the funding program as adopted by the county commissioners of Yellowstone County violate section 16-807, R.C.M. 1947?

2. Is the county commissioners' action in contracting with defendant construction companies ultra vires because it limits future boards in the exercise of their governmental powers?

3. Is the use of federal revenue sharing funds for the purpose of funding the multi-use building improper?

In the first issue, plaintiffs argue that the county commissioners, in using revenue sharing funds to finance the project, violated the terms of section 16-807, R.C.M. 1947, the

- 3 -

pertinent part of which states:

" * * * No county must incur any indebtedness
or liability for any single purpose to an
amount exceeding forty thousand dollars
($40,000) without the approval of a majority
of the electors thereof voting at an election
to be provided by law."

In State ex rel. Diederichs v. State Highway Commission, 89 Mont. 205, 211, 296 P. 1033, this Court explained the purpose of Art. XIII § 2 of the 1889 Montana Constitution which forbade the legislature from incurring a debt or liability in excess of $100,000 without submitting the question to a vote of the people:

"Knowing the tendency of governments to run
in debt, to incur liabilities, and thereby
to affect the faith and credit of the state
in matters of finance, thus imposing addit-
ional burdens upon the taxpaying public, the
framers of the Constitution placed positive
limitations upon the power of the legislative
assembly to incur a debt or impose a liabil-
ity upon the state beyond the limit prescribed,
without referring the proposition to the elec-
torate for its approval."

Thus, the question to be decided here is whether the expenditure of revenue sharing funds creates an "indebtedness or liability" within the meaning of the statute thereby imposing additional tax burdens upon the residents of Yellowstone County.

In State ex rel. Diederichs v. Board of Trustees of Missoula County High School, 91 Mont. 300, 307, 7 P.2d 543, the plaintiff sought to enjoin the Board of Trustees of Missoula County High School from applying fire insurance proceeds to rebuild a high school. In holding that the expenditure of the funds did not constitute an "indebtedness or liability" this Court stated:

"It seems plain that the constitutional limi-
tation does not apply to the expenditure of cash
on hand provided for a specific purpose; but
rather to the creation of an obligation to be
met and paid in the future by the taxpayers.
[Citing cases]."

Here, it is plain the revenue sharing funds are not an obligation to be "met and paid for in the future by the taxpayers".

- 4 -

In State ex rel. Rankin v. State Board of Examiners, 59 Mont. 557, 197 P. 988, this Court held that the words "indebtedness or liability" meant the creation of a debt or obligation in excess of "cash on hand and revenues having a potential existence by virtue of existing revenue laws." See also: Graham v. State Board of Examiners, 116 Mont. 584, 155 P.2d 956.

The expenditure of the federal revenue sharing funds does not incur an "indebtedness or a liability" of the county within the meaning of the statutory restriction. Section 16-807, R.C.M. 1947, was never intended to prevent the expenditure of revenue provided for a specific purpose as noted in Diederichs v. Board of Trustees of Missoula County High School, supra. Had the legislature intended that result, it would have used the term "expenditure" instead of the terms "indebtedness or liability". As stated, the manifest purpose of the statute is to prevent the taxpayers from being burdened with oppressive taxation. Here, the county commissioners are not obligating the taxpayers to pay any additional sums over and above the amount included in the bond issue to finance the project. The entire costs of construction are to be paid from the bond issue, insurance proceeds and revenue sharing funds. Thus, the evil which the statute is designed to prevent, will never come into existence here. In the second issue plaintiffs argue the action of the county commissioners is ultra vires because it limits future boards in the exercise of their governmental functions. We disagree.

In Bennett v. Petroleum County, 87 Mont. 436, 447, 288 P. 1018, a taxpayer brought suit to enjoin the county commissioners of Petroleum County from leasing a building to be used as a courthouse for a period of four years with an option to renew the lease for an additional four year period. The plaintiff contended, inter alia, that the lease was void because it extended beyond the

terms of office of individual members of the board of county commissioners.  At the time the lease was entered into, Section 4465 Rev. Codes 1921, as amended by Chap 38, Laws of 1929 authorized the board to lease real property necessary for the use of the county.  This Court upheld the validity of the lease with these words:

> "The statute specifically confers the power to so contract upon the board of county commissioners, the body existing at the time, and the mere fact that the term of office of a member of the body which so contracts may expire before the contract, does not in any manner affect its validity.  Were the rule of law otherwise, the business of counties would be very greatly hampered and at times, suspended, with resulting damage.  The board of county commissioners functions for the municipal corporation in its authorized powers as a continuous body, and while the personnel of its membership changes, the corporation continues unchanged.  The county has power to contract, and its contracts are the contracts of its board of county commissioners, not of the individual members thereof."

We agree with this reasoning.  By statute, the board of county commissioners has the power to erect a recreation center. Section 16-1008A, R.C.M. 1947.  Since the board has this power, it can enter into construction contracts that extend beyond the terms of office of the individual members of the board.  Were the rule otherwise, the board would be unable to enter into long-term construction contracts to erect public buildings as contemplated by section 16-1008A, R.C.M. 1947.  Such a result would be detrimental to the residents of Yellowstone County.

Plaintiffs cornerstone much of their argument on this issue in what this Court recently held in Burlington Northern v. Flathead County, 162 Mont. 371, 512 P.2d 710, 30 St.Rep. 684, and Burlington Northern v. Richland Co., 162 Mont. 364, 512 P.2d 707, 30 St.Rep. 691.  The holding in those two cases was based on an interpretation of section 16-807, R.C.M. 1947, which is relied upon by the plaintiffs here.  However, this case is factually different

- 6 -

than the above cases for there the county commissioners attempted, by use of the taxing authority, to circumvent Section 5, Article XIII of the 1889 Montana State Constitution and section 16-807, R.C.M. 1947, by budgeting excessively in order to obtain and expend a built-up reserve in subsequent fiscal years. Here, plaintiffs treat the revenue sharing fund payments as money budgeted and un-expended at the end of the fiscal year. Further, they argue that these funds should be placed in the general fund to be used to reduce taxes in subsequent years. To so hold would be for this Court to eliminate many, if not all, of the permissible expenditures allowed by Congress under section 31, C.F.R. 51.31. Too, it would mean that revenue sharing funds, unless spent prior to July 1 of each fiscal year, would be used only to reduce taxes. To carry out the purposes of the revenue sharing act it must be given a more liberal interpretation.

It was contemplated by Public Law 92-512 (revenue sharing statute) Section 103, and it was the expectation of the President and Congress in passing and signing the Act that many new capital improvements would be made by the various municipal and county governments throughout the country. We note that in passing the Act, and setting aside trust funds through December 1976, and making necessary the expending of or obligating the funds within two years of receipt thereof, that Congress intended the various governing units could and would rely on receiving same through December 1976. We can find no violation of section 16-807, R.C.M. 1947, nor is this finding contra to our holdings in the Flathead County and Richland County cases.

In the third issue, plaintiffs argue that the expenditure of revenue sharing funds for the purpose of financing a recreation center is illegal because the revenue sharing act forbids the capital expenditure of funds for recreation-type buildings.

- 7 -

The State and Local Assistance Act, P.L. 92-512, Section 103, 1972, more commonly known as the Federal Revenue Sharing Act, allocates federal revenues to state and local governments to be used only for "priority expenditures". The act has defined "priority expenditures" as ordinary and necessary maintenance and operating expenses for public safety, environmental protection, public transportation, health, recreation, libraries, social services for the poor or aged, financial administration, and ordinary and necessary capital expenditures authorized by law. 31 U.S.C.A. § 1222.

To qualify for the funds a unit of local government must establish a trust fund to deposit all payments received and use the funds for "priority expenditures". A penalty of 110% of the amount expended is assessed against the local government if funds are allocated in violation of the Act. See: 31 U.S.C.A. § 1243(a)(3). The local government is also required to provide for the expenditure of the funds in accordance with the applicable laws dealing with the expenditure of its own revenues. See: 31 U.S.C.A. § 1243(a)(4).

Plaintiffs argue that the funds are illegally spent because a recreation center is not an "ordinary and necessary capital expenditure authorized by law." We disagree with such a restrictive reading of the Act. See Murphy v. McClintock, 160 Mont. 355, 503 P.2d 1013, 29 St.Rep. 883; Skaggs Drug Centers v. Mont. Liquor Control, 146 Mont. 115, 404 P.2d 511.

The word "ordinary" is defined in Black's Law Dictionary (4th Ed.) as:

> "Regular; usual; normal; common; often recurring; according to established order; settled; customary; reasonable; not characterized by peculiar or unusual circumstances; belonging to, exercised by, or characteristic of, the normal or average individual."

The word "necessary" is defined in Black's Law Dictionary (4th Ed.) as:

> "This word must be considered in the connection in which it is used, as it is a word susceptible of various meanings. It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought. It is an adjective expressing degrees, and may express mere convenience or that which is indispensable or an absolute physical necessity. It may mean something which in the accomplishment of a given object cannot be dispensed with, or it may mean something reasonably useful and proper, and of greater or lesser benefit or convenience, and its force and meaning must be determined with relation to the particular object sought."

The Federal Revenue Sharing Act is broad in scope with the purpose of aiding local givernments defray the cost of capital expenditures. It accordingly appears to us that the words "ordinary and necessary" should be construed liberally and with latitude. It is our opinion that the multi-use building in question is "reasonable", "useful" and "proper", and within the terms of the Act.

The judgment of the district court is affirmed.

_____
Justice

We concur:

------------------------------

------------------------------
Justices

_____
Hon. Paul Hatfield, District Judge, sitting in place of Mr. Justice Frank I. Haswell.

Mr. Justice Thomas Dignan, District Judge, sitting in place of Mr. Chief Justice James T. Harrison, dissents.

- 9 -

_____
District Judge